UNITED STATES, Appellee

v

DONALD E. DOWNARD, Lieutenant Colonel, U. S. Army, Appellant

6 USCMA 538, 20 CMR 254

No. 6654

Decided December 16, 1955

*Major Edwin Doran* argued the cause for Appellant, Accused.

*First Lieutenant Peter J. Hughes* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant A. Kenneth Pye.*

## Opinion of the Court

PAUL W. BROSMAN, Judge:

In ten specifications, the accused, Downard, was charged before an Army general court-martial with having wrongfully and dishonorably failed to maintain sufficient funds to cover the payment of certain checks placed in commercial channels by him, in violation of the Uniform Code of Military Justice, Article 134, 50 USC § 728—and also with the willful disobedience of the order of a superior officer, in violation of the Code, supra, Article 90, 50 USC § 684.

In returning its findings of guilty under the ten worthless check specifications, however, the court-martial expressly excepted the word "dishonorably," as used therein, and substituted in its stead the term "discreditably." Although the convening authority disapproved the findings of guilty under the willful disobedience charge, he affirmed the remaining ones, as amended, as well as the sentence to dismissal and total forfeitures. Following affirmance by a Service board of review, we granted the accused's petition for the purpose of determining (1) whether there exists under the Uniform Code an offense of "wrongfully and *discreditably* failing to maintain sufficient funds," and (2) whether the law officer's instruction on honest mistake of fact, "not the result of . . . negligence, indifference, or irresponsibility," was correct. (Italics supplied.)

## II

Because the evidence adduced by the Government established conclusively that the accused executed the checks which were subsequently dishonored, we need not concern ourselves with a detailed recitation of facts. We observe, however, that Downard's defense was one of mistake—that is, he asserted that, at the time he issued the paper in question, he believed that funds sufficient for payment had been deposited to his account by third parties acting at his request.

In advising the members of the court on the elements of the worthless check crimes alleged, the law officer discussed in some detail the offense of making and uttering a check for value with knowledge, active or constructive, that the banking account on which it was drawn contained insufficient funds to meet payment, and without an honest intent that sufficient money be on deposit for the purpose. Thereafter he referred to what was described as a lesser offense, included within the crime mentioned in the preceding sentence, and supportable by proof of a different nature. The elements of this lesser crime were defined as follows:

"First, that the accused, at the time and place alleged in each specification, made the check described, and uttered it to the organization or banking institution alleged, and received the value alleged therefor;

"Second, that the check was dishonored for insufficiency of funds upon presentment at the bank upon which it was drawn;

"Third, that at some time after he had made and uttered each check for value, and before that particular check was presented for payment by the holder in due course, the accused, *because of such negligence, indifference, or irresponsibility as is sufficient to bring discredit upon the armed forces,* failed to have sufficient funds on deposit to pay the check." [Italics supplied.]

Recognizing that the accused had defended on the ground that he had labored under a mistaken belief that funds in sufficient quantity to cover the checks in suit had been deposited to his account prior to their issuance, the law officer remarked:

**539**

"With respect to this evidence, the court is advised that if the accused was laboring under such a mistaken belief and if his mistake was *honest and, under the circumstances, was not the result of such negligence, indifference, or irresponsibility as is sufficient to bring discredit upon the armed forces,* he cannot be found guilty of the lesser offense of making and uttering a check and thereafter wrongfully and discreditably failing to maintain sufficient funds in his account to pay the check when it is presented for payment in due course, for the law recognizes such a belief to be a defense. However, if the accused's mistake, although honest, was the result of such negligence, indifference, or irresponsibility as is sufficient to bring discredit upon the armed forces, it is not a defense to this lessor included offense." [Italics supplied.]

The court-martial then went into closed session, reopened after due deliberation, and announced findings of not guilty of the offenses charged, but, in all instances, guilty of the lesser included crime of *discreditably*—not dishonorably—failing to maintain funds as alleged. Our principal task is to determine whether such an infraction of law is recognized in the military system.

### III

In enacting Article 134—characterized as the "General article"—Congress sought to proscribe three sorts of misconduct: (1) that which prejudices "good order and discipline in the armed forces," (2) that which brings "discredit upon the armed forces," and (3) that variety collected under the head of "crimes and offenses not capital." As the present case comes to us, it would appear that the acts of the accused are made punishable only insofar as they constitute "conduct of a nature to bring discredit" on the

military service. Necessarily then, in seeking an answer to the question of whether discreditably failing to maintain funds in a banking account—that is, omitting to do so through negligence—amounts to a violation of a provision couched in such sweeping terms, considerable weight must be given to the language contained in the various editions of the Manual for Courts-Martial, and in precedents included within the law corpus of the several Armed Services.

The first appearance of worthless check offenses is to be found under the proscription of Article 95 of the Articles of War, 10 USC § 1567, which denounced "conduct unbecoming an officer and a gentleman."[1] Although not specifically defined in the statute, the conduct contemplated and condemned was the subject of descriptive comment in several sections of the 1928 Manual for Courts-Martial. For example, an officer who uttered a check drawn on a bank with knowledge—either actual or constructive—that sufficient funds were unavailable to pay it on presentment, and who did not intend that they be on deposit for the purpose, was subject to dismissal following trial by court-martial. Manual for Courts-Martial, U. S. Army, 1928, paragraph 151. And the same edition of that legal source recognized that this offense might be committed by conduct either accompanied by an intent to defraud, or without such a state of mind. Manual, supra, Appendix 4, page 253. Although a clear distinction between the fraudulent offense and its less reprehensible brother was not spelled out with care, it appears to have been recognized that something more than a mere negligent failure to maintain funds must be alleged and proved. At least, we find nothing in either the Manual or the Articles of War which suggests a contrary conclusion. Indeed the reverse is arguably true because of the very purpose of Article 95 to penalize "con-

---

[1] In its historical portions, the opinion relies only upon decisions of Army and Air Force boards of review. Apparently, the Navy's legal system prior to the Code did recognize an offense based on failing to maintain funds, but we have been unable to uncover any Navy decision specifically describing the elements of the crime. Therefore, our failure to cite Naval precedents is based not on inadvertence but on a lack of subject matter.

duct unbecoming an officer and a gentleman."

Twenty-one years later, the framers of the 1949 Manual readopted the pertinent provisions of the prior text. Again laid under the 95th Article of War, the crime had to do with the making and uttering of a check, with intent to defraud or otherwise, by an officer who knew, or reasonably should have known, that insufficient funds for payment on presentment were available, and who did not intend that they be on hand for the purpose. Manual for Courts-Martial, U. S. Army, 1949, paragraph 182. Literally no additional or qualifying language appeared which serves to suggest that carelessness in the maintenance of one's checking account—standing alone—was likely to result in criminal responsibility.

It is at once apparent that the two immediate predecessors to the current Manual—although they contain no more than the sketchy information adverted to earlier—advisedly limited the scope of worthless check offenses to the situation described in the preceding paragraphs. In no provision of either edition is mention made of a third type of crime involving the issuance of checks against insufficient funds. If any sort of similar offense based on a lesser degree of culpability was recognized before the enactment of the Uniform Code, therefore, it must have been pricked out by the decisions of the several Service boards of review.

Although information touching early court-martial appeals is notoriously incomplete, it is nevertheless clear that prior to 1940, at least, no conviction of a worthless check offense based on Article of War 96—the predecessor of today's Article 134, under which the present accused was tried—was bottomed on a mere *negligent* failure to maintain sufficient funds. See Dig Op JAG, 1912–1940, § 454(66), CM 202601; Dig Op JAG, supra, § 454(67), CM 154131. However, a few later decisions—quite without citation of legal precedent or statutory authority—purported to base criminal responsibility on a lack of due care alone. See United States v Norren, 32 BR 95, 102 (1944); United States v Hebb, 32 BR 397 (1944); United States v Van Eck, 11 BR-JC 175 (1951); United States v Hayes, 55 BR 319, 324 (1945). These latter decisions seem to predicate their determination on the notion that a mere negligent failure to maintain a bank balance sufficient to meet all checks presented reduces to conduct so detrimental to the good name of the Armed Force concerned that it may be said to fall within the ambit of the phrase "service discrediting"—a result reached in the face of Manual language couched in terms of "knowledge" and "honest intent."

Such was the conflict of authority found among Army boards of review prior to the promulgation of the 1951 Manual. In that year, however, the sweeping changes commanded by Congress in the enactment of the present Uniform Code resulted in a thoroughgoing overhaul of the military judicial system. Not the least of the innovations spawned by the adoption of the Code was the attempt by military legal draftsmen to delineate more carefully certain crimes theretofore defined solely at the whim of boards of review. The task of providing the elements of offenses growing out of an insufficient bank balance and setting out model specifications therefor, seems to have been a particularly difficult one. We must, therefore, determine whether the framers of the 1951 Manual sought to recognize any sort of new offense based on a merely *discreditable* failure to maintain sufficient funds—not a *dishonorable* one—and if not, whether such a crime has become firmly established in that which might roughly be called the common law of the military establishment by reason of board of review decisions.

Turning first to the provisions of the current Manual, we find that the appendix containing model specifications contemplates *two* worthless check crimes, as such, described as follows: (1) The making and uttering of such a paper wrongfully and unlawfully, with intent to deceive, and thereafter wrongfully and *dishonorably* failing to maintain such funds to meet it. (2) The making and uttering of a check, with-

out intent to deceive, and thereafter wrongfully and *dishonorably* failing to maintain a sufficient balance. Manual for Courts-Martial, United States, 1951, Appendix 6c, page 489. No model specification setting out a third offense appears. Moreover, only the element of intent to deceive operates to distinguish the principal offense from the lesser. Manual, supra, Appendix 12, page 540; Appendix 6c, supra, note 489. And no additional included offense is mentioned in the Table of Maximum Punishments. Manual, supra, paragraph 127c, page 225.

Conviction of the greater crime—one based on a deceitful purpose—carries with it, according to the Table, a maximum permissible punishment of dishonorable discharge, total forfeitures and confinement at hard labor for six months. On the other hand, the want of an intent to deceive results in a reduction of the maximum punishment to not more than confinement for four months plus a forfeiture of two-thirds pay for four months. Manual, supra, paragraph 127c, page 225. It would seem, therefore, that a second reduction could hardly have been contemplated—indeed, it is arguable that conviction of an additional lessor offense would justify virtually no punitive action.[2] It is apparent that nowhere among the provisions of the 1951 Manual do we find reference made to an offense characterized by a discreditable or negligent failure to maintain funds—as distinguished from a dishonorable one. We must, therefore, advert once more to the decisions of military judicial agencies to determine whether such a crime appears to be recognized.

A survey of board of review opinions reveals the presence of two divergent views. On the one hand, Air Force appellate agencies have refused to hold that a merely negligent failure to maintain funds is punishable under the Uniform Code. United States v Worsham [ACM S-6171] 10 CMR 653; United States v Sanders [ACM 6563] 11 CMR 840. This conclusion is based mainly on the notion that the term "dishonorable" connotes a state of mind amounting to gross indifference or bad faith—and that a conviction of a check offense which is supported by a finding of simple negligence alone will not suffice. See United States v Friend [ACM 4821], 5 CMR 638; United States v Reitman [ACM S-4621], 7 CMR 685.

Army boards of review, however, have reached a contrary conclusion. In United States v Lambert [CM 367163], 13 CMR 360, the accused was charged with, and convicted of, making and uttering a check and thereafter discreditably failing to maintain a sufficient balance to meet it, in violation of Article 134. Citing earlier Army precedents—most of which have been noted in a preceding paragraph of this opinion—the board concluded that the conduct of the accused was properly characterized as "wrongful and discreditable." And in so holding, its members placed squarely on the accused the burden of showing that his failure to maintain sufficient funds was not due to his own negligence.

Of the two approaches we distinctly prefer that taken by the Air Force. In this connection, our attention is drawn to the interesting history of the word "dishonorable." Behaviour on the part of a commissioned officer found to be "scandalous" or "infamous," was punishable by court-martial under the 1775 Articles of War. See Winthrop, Military Law and Precedents, 2d ed, 1920 Reprint, page 710. Later, these terms were eliminated from Article 61 of the revised Articles of War, but the nature of the conduct proscribed remained substantially the same. That

---

[2] It is recognized that the Table of Maximum Punishments is not generally binding on courts-martial in sentencing "officers, warrant officers, aviation cadets, cadets, midshipmen, and civilians subject to military law." See Manual for Courts-Martial, United States, 1951, paragraph 127a. It is also recognized that officers of the Armed Forces are and must be held to a somewhat higher standard of conduct and responsibility than are enlisted persons—and that the accused here is an officer. It is believed, however, that the consideration of the Table contained in the body of the opinion is relevant to a full treatment of the general question before us.

is to say, the acts forming the basis of the charge must have been committed under such circumstances as to bring *dishonor* on the profession of arms through dishonoring the actor. Winthrop, supra, page 712.

Thus, the offense of *dishonorable* neglect to discharge pecuniary obligations contemplated that the failure to pay be characterized by deceit, evasion, false promises, denial of indebtedness, or other distinctly culpable circumstances. Winthrop, supra, page 715, note 42. Model specifications under the general article setting out the offense of dishonorably failing to pay a debt have appeared in every Manual. See, e.g., Manual for Courts-Martial, U. S. Army, 1928, page 255; Manual for Courts-Martial, U. S. Army, 1949, page 329; Manual for Courts-Martial, United States, 1951, page 490. And boards of review in the offices of The Judge Advocates General of both the Army and the Air Force have consistently required proof of a "false or deceitful purpose," or "a fraudulent design to evade payment" as an essential element of this offense. See United States v Little, 1 CMR (AF) 182, and authorities collected there; United States v Waterman, 7 BR-JC 45; United States v London, 8 BR-JC 57; United States v Friend, supra, page 642. It is, therefore, apparent that the observation made by Air Force boards to the effect that use of the term "dishonorable" implies something more than mere negligence rests on solid ground.

We are the more persuaded by the reasoning relied on to support the Air Force position when we are met by a certain amount of conflict within the Army appellate system itself. In United States v Starr, [CM 348563], 3 CMR 220, a board of review of the latter Service discussed the offense of wrongfully and dishonorably failing to maintain sufficient funds, and concluded that the conduct of the accused before it reflected "dishonorable conduct *and not merely inadvertence, indifference or carelessness.*" (Italics supplied.) Yet this very decision constituted the authority relied on principally in United States v Lambert, supra, which enunciated the proposition that a "wrongful and *discreditable*" failure to maintain funds amounts to a military offense based on simple negligence. When these decisions are read —together with the inconsistent pronouncements of earlier Army cases— we cannot at all say that a new worthless check offense, the gravamen of which is mere failure to adhere to the standard of care normally resulting in civil liability only, has become so much an integral part of the body of military law that it must now be recognized in the absence of explicit statutory recognition.[3]

This conclusion is bolstered substantially, we believe, by our reading of pertinent provisions of the current Manual. We are told there that a specification must include—in language clear enough to inform the accused of the nature of the accusation against him—a statement embracing the elements of the offense alleged. But more important, if the challenged act of the accused is not necessarily an offense of itself—but is made so by statute, regulations, or custom having the force of law—words importing *criminality* such as "wrongfully," "without authority," or "dishonorably," should be used to describe the accused's acts. Manual, 1951, supra, paragraph 28a(3).

Against a backdrop of these observations, we note that the framers of the

---

[3] This is the second appearance of this accused officer before us. See United States v Downard, 1 USCMA 346, 3 CMR 80. Earlier he was tried under two specifications alleging conduct unbecoming an officer and a gentleman—in that he assaulted and used obscene language toward his wife in an officer's club. He was found guilty as charged, but in this Court was the beneficiary of a ruling based on instructional error with respect to the sentence. Once more here he is the legatee of action of similar genre.

It is unnecessary in the present case to express an opinion on the question of whether the evidence reflected in the record would have safely sustained a finding that the accused *dishonorably* failed to maintain funds—indeed, it would be improper for us to do so.

1951 Manual, in drafting the model specification having to do with the making and uttering of worthless checks, employed language substantially similar to that utilized by them in providing an allegation of a failure to pay debts. The word "dishonorable," which had theretofore appeared only in setting out the elements of the latter offense, is now lodged securely as a term of art in the current Manual language relating to the crime of making and uttering a worthless check without intent to deceive. It seems clear to us that in selecting the term "dishonorable" the draftsmen meant to adopt a word importing a criminal state of mind of some variety—short of the requirement of a specific intent—to characterize the behaviour of the accused. Since the historical interpretation of the adjective "dishonorable" bears out this conclusion, we experience no hesitation in holding that the framers of the Manual envisaged but two worthless check offenses and no others—the one characterized by a specific intent to deceive; the other requiring bad faith or gross indifference.

Our conclusion is undisturbed by the suggestion that the appearance of the word "wrongfully" in the specification under consideration—a term not specifically excepted by the court-martial in announcing its findings—sufficiently alleged a state of mind of the sort described above. It may conceivably be true that reference to a "wrongful" act implies in some degree or other that the actor should be subjected to penal liability. However, the Manual has specifically provided that "if the alleged act of the accused would not under any circumstances be an offense, the mere addition to the specification of words importing criminality will not in itself convert the act to an offense." Manual, 1951, supra, paragraph 28a(3). Since we hold specifically that there is no offense of negligently failing to maintain a sufficient bank balance, the use of additional terminology in the specification purporting to allege such a crime constitutes mere surplusage and may be disregarded.

544

## IV

It is now proposed that we should recognize by judicial fiat that which Congress and the executive draftsmen have ignored. Thus, we are urged to 'seize upon the framework thrown together by certain isolated and dubious military decisions, and to construct therefrom a new and full-fledged member of the family of worthless check crimes. We need express no view concerning either the need within the military establishment, or the defensibility, of such an offense based on simple negligence. It is enough to say that we are unwilling—and, in a strict sense, powerless—to create one. As we have already observed, this Court—itself a creature of statute—is entrusted, among other chores, with the task of safeguarding the act of Congress which brought it into existence. Our function then is not to invent or devise, but to interpret—not only the Code, but its junior relative, the Manual, as well. This we have essayed to do with respect to the problem before us—with the result that we find in these sources of authority no sort of purpose to provide that a worthless check offense grounded on nothing more than simple negligence should take its place beside crimes of similar mold. See United States v Norris, 2 USCMA 236, 8 CMR 36.

Perhaps—as it has been argued—sound policy dictates that military law *should* recognize an offense in the nature of "discreditably failing to maintain sufficient funds." At any rate, it cannot be denied effectively that *any* degree of carelessness which results in the dishonor of commercial paper—particularly when payable to members of the civilian community—reflects *some* measure of discredit on the Service concerned. Nevertheless, we are sure that, in the present posture of the problem, the preferable view—and the one we expressly adopt—is to the effect that a failure to meet that fictitious standard of care having to do with a reasonably prudent man should not subject an individual to criminal accountability. We are sure that we should not say that it does, unless required to do so by statute or ancient

usage. See United States v Greenwood, 6 USCMA 209, 19 CMR 335.

Civilian courts have long distinguished between the "negligence" required to impose tort liability and that lack of care which may result in criminal prosecution. See Hull's Case, Kelyng 40, 84 Eng Rep 1072 (1664); Reg v Finney, 12 Cox CC 625 (1874). Although we have no wish to engage in semantic controversy regarding the meaning of such judicial phrases as "criminal negligence," "culpable negligence," or that classic example of patent ambiguity, "wilful, wanton negligence," we are certain that "a distance separates the negligence which renders one criminally liable from that which establishes civil liability." People v Bearden, 290 NY 478, 483, 49 NE 2d 785 (1943). It is true, of course, that in certain American states negligent homicide statutes require no more than a showing that death was caused by "ordinary" negligence. See People v Robinson, 253 Mich 507, 235 NW 236 (1931); State v Ramser, 17 Wash 2d 581, 136 P2d 1013 (1943); but see People v Murray, 58 Cal App2d 239, 136 P2d 389 (1943). Both the Army and the Air Force have traditionally reached an identical conclusion.

See United States v Kirchner, 1 USCMA 477, 4 CMR 69. In the present problem, however, the civilian authorities afford no whit of comfort to the Government, for state statutes proscribing the passing of bogus checks unanimously require either a specific intent or a general criminal state of mind. See 95 ALR 486 and collected cases; Miller, Criminal Law, 1934 ed, page 390. Moreover, as a general proposition, the trend seems to be toward the restriction of penal liability to those acts or omissions which are accompanied by at least something in the nature of *mens rea*. See Hall, General Principles of Criminal Law, 1947 ed, page 225 et seq.

V

It follows from what has been said that the findings and sentence are of no effect, and that dismissal of the charge in the case before us is required. Because of this action, it is unnecessary that we consider the second assignment of error.

The decision of the board of review is reversed and the charge is dismissed.

Chief Judge QUINN and Judge LATIMER concur.