UNITED STATES, Appellant

v

JACK O. CLAY, Private First Class,
U. S. Army, Appellee

11 USCMA 422, 29 CMR 238

No. 13,760

Decided April 29, 1960

*Major John G. Lovrien* argued the cause for Appellant, United States. With him on the brief was *Lieutenant Colonel James G. McConaughy.*

*Lieutenant Colonel W. H. Blackmarr* argued the cause for Appellee, Accused. With him on the brief was *First Lieutenant Richard P. Nee.*

Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Pursuant to Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, The Judge Advocate General of the Army has certified the record of trial to this Court on the following issue:

Was the board of review correct in holding that the pleas of guilty were improvident?

The accused was arraigned on two specifications alleging that, with intent to deceive, he issued checks on a bank in which he had no account, and thereafter wrongfully and dishonorably failed to place sufficient funds in the bank for payment on presentment. He pleaded guilty to both offenses. An out-of-court hearing was held before acceptance of the plea. During the hearing the law officer informed the accused of the meaning and effect of

the plea, and the punishment to which he was subject. He advised the accused he did not have to plead guilty and he told him to sit down with his counsel, both of whom were members of the bar, and "talk with them seriously" about the plea. When the accused indicated he had conferred with his counsel and that he understood the meaning and effect of the plea, he was advised by the law officer that he could change his plea any time before sentence, by merely telling the law officer or the court he did not want to plead guilty. The accused also informed the law officer he knew he had a right to civilian counsel or to military counsel of his own choice if reasonably available, but he was satisfied with the counsel representing him at the trial. Finally, he told the law officer he was pleading guilty because he knew he was guilty, and he

**422**

submitted as an appellate exhibit a letter entitled "Offer to Plead Guilty" in which he noted he had had a "full discussion" with his counsel about the offenses charged, and understood he was presumed to be innocent, and that the burden of proving his guilt beyond a reasonable doubt rested upon the Government; however, he wanted to plead guilty "in the hope" he would secure a more "lenient final sentence."

When court reconvened, the accused's plea of guilty was formally accepted and the case proceeded to findings and sentence. During the sentence procedure the accused testified under oath. He said he had been previously convicted of desertion and sentenced to a dishonorable discharge and confinement at hard labor for one year. Execution of the dishonorable discharge was suspended. Eventually, the accused was released from confinement and restored to duty. However, he did not want to remain in the service. While absent without authority, he had been married and had obtained a job which was "waiting" for him if he could be discharged from the service. As a result the accused "wanted to be separated." His desire was strengthened when he was transferred from Pennsylvania to Oklahoma and separated from his wife. She had initiated a proceeding for divorce, but the accused believed that if he were out of the service and near her, he could "get everything patched up."

Immediately upon arrival at his new post in Oklahoma the accused inquired at the legal office about the possibility of separation. He was informed there was "no way that . . . [he] could get out of the service unless there was some other cause" than the court-martial he had been given. Later the accused consulted his commanding officer, the executive officer, and his first sergeant, but "No one of them helped . . . [him] in any form or fashion." The accused then began to review the regulations to find a way to obtain his discharge. What transpired as a result of his research is best recounted in the accused's own words:

". . . So I came across AR 635–208. Section II, paragraph 3e, covers unstable financial accounts. And under 209, there is traits and habits in it. So I figured if I showed some evidence of some way that they might be able to eliminate me from the service. That is the only sole purpose I wrote those checks. At all times I had money to cover them. I have also had the money to pay the service charges. The money is on deposit in my battery commander's safe and it has been since the first day I was notified.

•   •   •   •   •   •   •

"Q. [DC] Concerning these checks, what action did you take, after you wrote the checks, relative to the checks?

"A. The action I taken, sir, as soon as I found out about them, the sergeant . . . .

"Q. Tell me how you found out about them and what you did with them.

"A. Well, my job was battery clerk in the unit. And the CI agent called up and asked for the first sergeant. At that time, I didn't know who he was. And I handed the phone to the first sergeant. And the first sergeant answered the phone. And Sergeant Moore was in the orderly room at the time he answered the phone. He turned to Sergeant Moore and said, 'Did you cash a check for someone?' Sergeant Moore pointed to me. The first sergeant informed him the check was returned and he would have to go down and pick it up. I gave Sergeant Moore $20.00, and the check was for $15.00. At that time, Sergeant Moore went down to the CI agent, and they would not let him pick up the check. And he turned around and gave my $20.00 back. The next day I had to go down and talk to the CI agent, and I told him I wanted to pick the checks up. And he said I would have to do that on my own. Then I went to the Main PX and I tried to pick them up, and they informed me I was at the wrong building and

**423**

would have to go to the main office. I had no transportation of my own. I had to get a post taxi, and since it was not official business I couldn't get one. About four o'clock that afternoon, my battery commander called me in and told me he was placing me in pretrial confinement. At that time, I gave him two $20.00 bills, which he put in his safe. I explained to him what they were for."

On review of the record of trial, the board of review concluded the circumstances did not show the "animus" required for a criminal conviction and that the accused "grossly misapprehended his legal position." It, therefore, set aside the conviction on the ground that the accused's plea of guilty was improvident.

In our opinion, the board of review misunderstood the effect of the accused's testimony. Nowhere did he disclaim the possession of an intent to deceive the payees when he gave them checks drawn upon nonexistent accounts. In fact, we venture to suggest that had the accused made known his purpose, the payees would have had nothing to do with the transaction. Also, nowhere in his testimony did the accused deny he dishonorably failed to deposit sufficient funds to pay the checks on presentment, and that his act resulted in discredit to the armed services. Thus, none of the essential elements of the offenses were denied or repudiated by the accused. True, he said he engaged in his scheme for the purpose of obtaining an administrative discharge. Thus, we know why the accused committed the offenses charged, but the reason does not detract one iota from the criminal character of the acts. As we pointed out in United States v Boudreau, 9 USCMA 286, 26 CMR 66, the motive or purpose behind an act does not necessarily indicate the presence or absence of the kind of intent which the law requires to make the act criminal. The accused by his plea of guilty judicially admitted he possessed the required criminal state of mind necessary for the offenses charged. He

thought his conduct would lead to administrative separation from the service. He was mistaken in that belief but his error is not a legal defense to the acts charged. A private scale of values cannot limit the operation or the effect of the penal code. United States v Cummins, 9 USCMA 669, 673, 26 CMR 449.

In its opinion, the board of review appears to have attached considerable importance to the fact that the accused "deposit[ed] money with the company commander, in escrow, to insure against loss to the payees, attempting by this process only to establish an 'unstable financial condition,' and thus technically come within the purview of AR 635-208." What the board of review seems to be saying is that the accused did not believe the course of conduct he chose to follow would amount to a violation of the Uniform Code.

The board of review may be entirely correct in that conclusion. But the evidence unmistakably shows the accused expressly intended to deceive the payees as to the fictitious bank accounts and that he thereafter failed to deposit funds for payment of the checks, to the discredit of the armed services. The accused may at all times have intended to reimburse the payees to the extent of their actual pecuniary loss, but it is unmistakably clear he intended reimbursement only after discovery of his misdeeds. In other words, subsequent reimbursement was simply a means of qualifying the accused as a candidate for administrative disciplinary action. Repayment did not wipe out the earlier deception, dishonor, and discredit to the armed services. The record of trial compellingly shows that the accused miscalculated the disciplinary consequences of his deliberate course of misconduct. This miscalculation is in no way inconsistent with the commission of the offenses to which he pleaded guilty. We conclude, therefore, that the board of review erred as a matter of law in holding that the plea of guilty was improvident.

We answer the certified question in

424

the negative. The record of trial is returned to The Judge Advocate General for submission to the board of review for further proceedings consistent with this opinion.

Judge LATIMER concurs.

FERGUSON, Judge (dissenting).
I dissent.

In my opinion, the accused's post-findings testimony is so inconsistent with his plea of guilty to the offenses charged that the plea must be set aside.

Accused, pursuant to his plea, was found guilty of wrongfully and unlawfully uttering two worthless checks, with intent to deceive, and thereafter dishonorably failing to place sufficient funds on deposit in the appropriate banks for their payment upon presentment. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade.

The meaning and effect of accused's plea of guilty was explained to him by the law officer and he persisted therein after stating that he was in fact guilty. A stipulation of the parties to the trial establishes that, on August 26, 1959, accused drew a check in favor of Sergeant First Class Charles R. Matthews in the amount of $20.00. Sergeant Matthews cashed the check at the local post exchange and gave the accused $10.00, retaining the balance of the proceeds for himself. On August 27, 1959, the accused drew another check in favor of Sergeant George N. Moore, in the amount of $15.00. Sergeant Moore also cashed his check at the post exchange. Neither check was honored by the separate banks upon which they were drawn, for accused had no accounts therein.

Following announcement of the findings of guilty, the accused elected to testify in mitigation and extenuation. He stated that he had been involuntarily restored to duty after serving a portion of a sentence adjudged by a previous general court-martial. Believing immediate separation from the armed services to be necessary to the solution of marital problems, he sought from various sources advice concerning methods by which he might obtain a discharge. His lack of success led him to study the provisions of various Army publications. Perusal of Army Regulations 635–208 caused him to conclude he might be able to obtain an administrative separation from the service if he were to produce evidence of his financial instability. Accordingly, he decided to make and utter the worthless checks involved in this case. When they were returned dishonored, he described his actions as follows:

"A. Well, my job was battery clerk in the unit. And the CI agent called up and asked for the first sergeant. At that time, I didn't know who he was. And I handed the phone to the first sergeant. And the first sergeant answered the phone. And Sergeant Moore was in the orderly room at the time he answered the phone. He turned to Sergeant Moore and said, 'Did you cash a check for someone?' Sergeant Moore pointed to me. The first sergeant informed him the check was returned and he would have to go down and pick it up. I gave Sergeant Moore $20.00, and the check was for $15.00. At that time, Sergeant Moore went down to the CI agent, and they would not let him pick up the check. And he turned around and gave my $20.00 back. The next day I had to go down and talk to the CI agent, and I told him I wanted to pick the checks up. And he said I would have to do that on my own. Then I went to the Main PX and I tried to pick them up, and they informed me I was at the wrong building and would have to go to the main office. I had no transportation of my own. I had to get a post taxi, and since it was not official business I couldn't get one. About four o'clock that afternoon, my battery commander called me in and told me he was placing me in pretrial confinement. At that time I gave him two $20.00 bills, which he put in his safe. I explained to him what they were for."

**425**

In addition, trial defense counsel made an unsworn statement on behalf of the accused concerning the checks. He stated:

"He came back; and when he left the DB and went home for a short leave, he was under the impression that he could sign a few papers and go on out of the Army. He got back here and talked to Mr. Frank, and this idea went up in smoke. But he tried to do something which would create a basis for him so he could be removed from the service. *But he didn't want to injure anybody or for anybody to lose any property. The checks were all covered. The money was there and nobody was injured. The PX is the only person at the moment who is out anything, and that is because they won't give up the checks until this court-martial is over.*" [Emphasis supplied.]

In United States v Messenger, 2 USCMA 21, 6 CMR 21, we initially pointed out that an accused's statements in mitigation and extenuation, inconsistent with the judicial admissions involved in his plea of guilty, might, unless withdrawn, render his plea improvident. See also Manual for Courts-Martial, United States, 1951, paragraph 70*b*, and Uniform Code of Military Justice, Article 45, 10 USC § 845. We have reiterated that rule in later decisions. United States v Kitchen, 5 USCMA 541, 18 CMR 165; United States v Welker, 8 USCMA 647, 25 CMR 151. Indeed, in United States v Epperson, 10 USCMA 582, 28 CMR 148, we pointed out that doubt concerning the propriety of accused's plea in light of his post-findings testimony must be resolved in the defendant's favor. The inquiry facing us then is whether accused's declarations after the verdict of the court-martial indicate he could not have been guilty of the offense charged. I am sure that they do.

The elements of the offenses with which accused was charged involve proof that he made and uttered the checks described in the specifications; that he did such acts wrongfully and unlawfully *with intent to deceive;* that,

at the time of the making and uttering, the accused did not intend to have sufficient funds in the banks upon which the checks were drawn to pay the instruments upon presentment; that the accused thereafter *wrongfully and dishonorably* failed to place sufficient funds in the banks concerned for payment of such checks; and that his conduct was prejudicial to good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. United States v Downard, 6 USCMA 538, 20 CMR 254; United States v Lightfoot, 7 USCMA 686, 23 CMR 150. Department of the Army Pamphlet No. 27–9, April 1958, The Law Officer, page 110.

As the accused admits he made and uttered the two checks involved, knowing he had no accounts in the banks upon which they were drawn, the improvidence of his plea must be found in the elements relating to his intent to deceive and whether his conduct was, in law, dishonorable.

With respect to the question of intent, it may be at once admitted that accused's actions involved the deception of those to whom he uttered the worthless checks. It is apparent from the record they believed them to be valid. However, as pointed out by Judge Latimer in United States v Downard, supra, at pages 542, 543, the intent to deceive involved in the delict charged here is an intent pecuniarily to defraud the persons to whom the checks are negotiated. Otherwise, there would be no difference between the two types of worthless check offenses which we have recognized under Code, supra, Article 134, 10 USC § 934. United States v Lightfoot, supra. Here, accused's statements clearly indicate he did not possess the intent required for guilt of the crimes charged. He specifically denied intending to defraud or injure the pecuniary interests of any person. In effect, he sought to insure that no one suffered loss by his actions, for he retained at all times in his possession the funds necessary to redeem the worthless instruments until he was placed in pretrial confinement.

426

At that time, however, he again reiterated his intention to save Sergeants Matthews and Moore harmless by posting the required amount of cash with his company commander. His conduct was in many ways similar to that which we characterized as noncriminal in United States v Hayes, 8 USCMA 627, 25 CMR 131. There, the Chief Judge, speaking for a majority of the Court, said:

". . . The intent to deprive the owner of his property, either permanently or temporarily, must include a *mens rea*. Therefore, the mere 'borrowing' of an article of property without the prior consent of the owner does not make out either of the offenses defined in Article 121. Something more is required, and that something is criminal intention. Thus, if one visits the office of a friend, and, finding him absent, takes a book which he has come to borrow, leaves a note to that effect, and returns the book the next day, there is no intent to steal or misappropriate the book and, necessarily, no violation of Article 121."

True it is, as the Chief Judge points out, that the accused was *motivated* by his desire to be released from the service. Nevertheless, his testimony and the statements made by counsel on his behalf also indicate beyond cavil that he lacked any *criminal* intent in uttering the checks.

That is not the end of the problem, however, for I also find in the post-findings proceedings another reason which demands that we hold accused's plea improvident. In United States v Downard, supra, a unanimous Court concluded that both bad check offenses under Code, supra, Article 134, involved a requirement that the accused act *dishonorably*. That term imports bad faith or gross indifference to the pecuniary consequences of his action. United States v Downard, supra, at page 544; concurring opinion of Judge Latimer, United States v Lightfoot, supra. In United States v Brand, 10 USCMA 437, 28 CMR 3, we stated that dishonorable conduct must be characterized by deceit, evasion, or other culpable circumstances. In that case, we held the evidence of guilt legally insufficient to support the findings, when it was shown that the accused, in accordance with a base policy, had attempted to redeem worthless checks prior to their dishonor and return by the bank upon which they were drawn. The facts in this case are substantially similar. The accused, lacking any intent to defraud the persons to whom he issued the checks, took every possible precaution to insure that there would be no financial loss to their recipients. His desire to secure evidence of irresponsibility is certainly not to be commended. On the other hand, it does not establish that degree of dishonor in financial matters which we have said to be necessary. United States v Brand, supra; United States v Downard, supra. His testimony and the statement of his counsel in mitigation and extenuation completely belie the existence of any pecuniary fraud or deceit in the transaction. Such being the case, the post-findings information presented to the court-martial on behalf of the accused is clearly inconsistent with his plea of guilty, and it should have been set aside by the law officer.

I would answer the certified question in the affirmative and uphold the decision of the board of review.