UNITED STATES, Appellee,

v

STEPHEN WALUSKI, Private, and RONALD H. HAUF,
Private First Class, U. S. Marine Corps, Appellants

6 USCMA 724, 21 CMR 46

725

No. 6842

Decided March 16, 1956

*Commander John W. Shields,* USN, argued the cause for Appellants, Accused.

*Major Charles B. Guy,* USMC, argued the cause for Appellee, United States.

ROBERT E. QUINN, Chief Judge:

The petitioners here were jointly tried and convicted of the commission of three offenses: involuntary manslaughter (Charge I), wrongful appropriation of a motor vehicle (Charge II), and leaving the scene of an accident (Charge III), in violation, respectively, of Articles 119, 121, and 134, Uniform Code of Military Justice, 50 USC §§ 713, 715, and 728. The court imposed a sentence upon each which includes a dishonorable discharge and confinement at hard labor for twenty-four months. The findings of guilty and the sentences, with some modification, were approved by the convening authority, and affirmed, without opinion, by a Navy board of review. We granted review to consider two issues: (1) whether the specification of Charge I alleges an offense, and (2) whether the evidence is sufficient to support the findings as to Charges I and III.

The specification of Charge I alleges that the accused "acting jointly and in pursuance of a common intent, did . . . by culpable negligence, unlawfully kill Whang Woa Sam, a Korean national . . . by means of running into him with an automobile." In my opinion, the allegation of the existence of a common intent between the accused is inconsistent with the nature of the offense which is based exclusively upon negligence. Involuntary manslaughter is described in paragraph 198b of the Manual for Courts-Martial, United States, 1951, as one "committed without an intent to kill or inflict great bodily harm; it is an unlawful killing by culpable negligence." Appellate defense counsel contends that the inconsistency is fatal to the validity of the charge. I disagree.

It is settled that pleading a common intent has no material effect upon the corpus delicti of the offense. Its function is "not to establish the guilt of the accused, but solely to justify the procedure of a joint trial," in an appropriate case. United States v Dolliole, 3 USCMA 101, 104, 11 CMR 101. It does not constitute an additional element of proof. Consequently, the allegation can be disregarded, without affecting the question of the accused's guilt or innocence. The remaining allegations are plainly sufficient to set out the offense of involuntary manslaughter through the culpably negligent operation of a motor vehicle. Article 119, Uniform Code of Military Justice, 50 USC § 713. Manual, supra, Appendix 6c, page 484. True, both accused are charged as principals in a single specification. From the nature of the act it would be expected, as indeed the evidence shows, that one was the operator, and the other a passenger in the vehicle. This predicates the theory that the former is the principal and that the latter's criminal responsibility, if any, depends upon his role as an aider and abettor. Under Article 77, Uniform Code of Military Justice, 50 USC § 671, however, an aider and abettor is a principal. From the viewpoint of pleading, he may properly be charged as if he had himself directly committed the offense, that is, as a principal. Manual for Courts-Martial, United States, 1951, Appendix 6c, form 9, page 471, United States v Wooten, 1 USCMA 358, 3 CMR 92. If either accused desired more particular details of his alleged participation in the offense, he should have moved for appropriate relief.

Turning to the evidence, it appears that on October 3, 1954, shortly before nightfall, the accused were hitchhiking along a road in Korea. They were offered a ride in a Turkish army jeep occupied by a Turkish major and his enlisted driver. Both accused sat on the rear seat. Their uniforms were clean and their appearance was neat. After proceeding about a mile, the Major told the driver to stop. When the vehicle halted, he dismounted and moved off the road. A few minutes later the driver also left the vehicle. He did not turn off the engine or the headlights. The accused remained on the rear seat. When the Turks were some distance from the jeep they heard its motor ac-

celerate. The Turkish driver testified that he saw one of the accused at the wheel and the other on the rear seat. As the vehicle started to move, he grabbed the rear but he could not hold on as the speed increased. After going about ten meters, he let go, and the vehicle disappeared in the dark.

About one-half hour later and about two miles from the place where the vehicle had been taken from the Turks, they came upon it. It was about ten feet off the road, in a muddy rice paddy. The vehicle had run into and killed a Korean named Whang Woa Sam. Neither of the accused was present at the scene. However, inside the jeep were found a partially filled whiskey bottle which had not been there before, a raincoat and a carbine which belonged to the Turks, and two Marine Corps utility caps, one of which had the name "Hauf" printed on the sweatband. Also found on the scene were a cigarette lighter and a wallet, which contained, among other things, Hauf's identification card. The lighter and the wallet were found "Just at the left side on the ground right by where you step out of your driver's seat." The jeep, which had a top but no sides, was damaged. The windshield was broken. None of its glass was found inside or around the vehicle. However, about 120 feet down the road, at the point at which the deceased was struck, some broken, bloodstained glass was found.

Both accused were brought into the area Provost Marshal's office about two hours after the fatal incident. Hauf's nose and face were cut and Waluski had a bad cut on his hand. Their clothes were bloody and covered with mud, and they had no hats. They attributed their appearance to the fact that they had been in a fight with some Koreans in the village. Hauf had no identification. He maintained that he lost it in the fight with the Koreans. Neither said anything about participating in the offenses charged.

At the trial, the Turkish major did not identify the accused as the hitchhikers, but the driver did. He could not say, however, which accused actually drove the vehicle. Insofar as the other offenses are concerned, Korean witnesses testified that they were walking along the road. Several persons were on the left shoulder and a number, including the decedent, were walking along the edge of the right side. Just behind them the road curved to the left. A jeep, travelling at a "common" or "full" speed, approached from the rear. It narrowly missed one of the pedestrians on the left shoulder of the road, then swung over to the right side and struck the decedent. After the impact, the jeep travelled about 120 feet; then it left the road and went into a muddy rice paddy. There it stopped with its front end facing the road. The witnesses could not identify the occupants of the vehicle, nor tell how many there were.

At the outset of any consideration of the evidence, it is appropriate to determine the effect, if any, of the proven offense of wrongful appropriation of the jeep. From the fact that the point of Whang Woa Sam's death was only two miles from the place of appropriation, the court-martial could reasonably conclude that the accused were in the process of effecting an escape with the fruits of their crime. Moreover, it could also infer that this circumstance would affect the speed of the vehicle, since the wrongdoers would have a natural desire to put as much distance as possible between themselves and their pursuers. But, assuming a causal connection between the wrongful appropriation, the speed of the jeep, and the care exercised in its operation, can the passenger be regarded as an aider and abettor of the operator so as to make him also liable for any resulting misconduct?

If the taking of the jeep occurred under circumstances amounting to robbery, possibly the situation would amount to "felony-murder." Article 118, Uniform Code of Military Justice, 50 USC § 712. Carter v United States, 223 F2d 332 (CA DC Cir) (1955). However, misappropriation is not one of the "felony-murder" offenses defined in the Uniform Code of Military Justice. Neither is it an offense "directly affecting the person." Consequently, it does not come within the class of offenses

described as "misdemeanor manslaughter." Article 119, Uniform Code of Military Justice, supra. As a result, the passenger's participation in the misappropriation cannot of itself provide a basis for an inference that the passenger aided, abetted, or gave encouragement to the driver in the culpably negligent operation of the vehicle. His guilt must be established by independent evidence of aiding or encouraging the driver in the vehicle's operation.

Moving directly to the Article 119 offense, I have no difficulty in concluding that the evidence supports a finding of culpable negligence. It shows that the vehicle rounded a curve on the wrong side of the road without any apparent diminution of speed. It swung from the left side, where it narrowly missed a pedestrian, clear across to the right edge. Although the speed of the vehicle was not explicitly determined, the court-martial could reasonably conclude from the evidence that it was too fast to permit the driver to exercise effective control over the vehicle. Considering all the circumstances, the court-martial was justified in finding that the jeep was operated in a manner indicating a culpable disregard of the foreseeable consequences. Manual, supra, paragraph 198b.

Homicide caused by the operation of a motor vehicle is an offense normally committed only by the driver. If both accused are to be held accountable for the victim's death, the liability of one must be predicated upon the fact that he aided and abetted the other. Article 77, Uniform Code, supra. Although not required to be set out in the specification, the aider and abettor status must be established by the evidence. And the evidence must show more than mere presence at the scene. Directly, or by necessary inference, it must show affirmative aid or encouragement to the person who actually commits the offense. United States v Jackson, 6 USCMA 193, 19 CMR 319. Relating these principles to this case, I find no basis in the evidence to support a finding that the passenger aided or encouraged the driver in the commission of the homicide. In the absence of such evidence the record of trial is insufficient to sustain the conviction of the passenger. Which accused then was the passenger?

A basis for differentiating the position of each accused clearly appears in the evidence. One of the prosecution witnesses testified that Hauf's wallet was found on the ground "right by where you step out of your driver's seat." Although there is also testimony to the effect that the wallet was found further toward the rear, the discrepancy was commented upon by both trial counsel and Hauf's lawyer, and the court-martial was free to accept either version. If it believed that the former was correct, could it then reasonably infer that Hauf was the driver? I think that it could.

It will be recalled that both accused had injuries when they were apprehended a short time after the incident. Hauf had cuts on his face and nose and Waluski had a badly cut hand. The windshield of the jeep was broken but no glass was found inside the vehicle or at the point where it came to rest. Had either accused been sitting on the rear seat and been cut by flying glass, we would expect that some glass would be in the jeep. Moreover, bloodstained glass was found on the road at the point where the deceased was struck. Consequently, notwithstanding that the Turkish soldier testified that when the vehicle was taken one of the accused was in the back seat, the court-martial could have found that both accused were in the front seat at the time of the casualty. It could also have found that on impact both accused fell forward and broke the windshield. In that case, the windshield glass would fall outward and thus account for its absence inside the jeep and for the presence of glass on the road at the point of the collision. With both accused placed on the front seat, the court-martial would be justified in concluding that each occupant left the vehicle in the natural and normal way, namely, through the exit at his side. Thus, the presence of Hauf's wallet on the driver's side supports the conclusion that Hauf was the

730

driver. Consequently, his conviction of Charge I is amply supported by the evidence.

Somewhat different is the problem of the sufficiency of the evidence of the offense of leaving the scene of an accident. The difference lies in whether the offense can be committed by the passenger as well as by the operator of the vehicle. If independent liability exists, then the evidence is sufficient to support the conviction of both accused. On the other hand, if the passenger can be liable only as an aider and abettor, I am faced with the problem of whether Waluski acted only independently or whether he also encouraged Hauf to flee.

Fleeing the scene of an accident is not specifically defined in the Uniform Code of Military Justice. Quite clearly, however, it is conduct which discredits the military service. United States v Eagleson, 3 USCMA 685, 14 CMR 103. A sample form of specification for the offense is set out in the Manual, supra, Appendix 6c, form 142. The form notes that "a passenger" and "the senior officer present" as well as the driver may be charged with the offense. However, the sample specification is only a procedural guide. By itself, it cannot create an offense.

The background of the sample specification was considered by this Court in United States v Eagleson, supra. We there held that "the specification form set out in the Manual, supra, is predicated upon the provisions of § 40–609, District of Columbia Code." The cited section of the District of Columbia Code unmistakably applies only to the operator of a motor vehicle involved in an accident. The statutes of the several states are to the same effect. The inescapable conclusion, therefore, is that a passenger is not independently liable for improperly leaving the scene of an accident. This exclusion, however, does not completely decide our problem. Ancient military custom can create standards of conduct. A violation of these standards is punishable under the general article. United States v Down-

ard, 6 USCMA 538, 20 CMR 254. I must, therefore, determine whether military law recognizes an ancient custom in this area.

A number of boards of review have considered the question of passenger responsibility. United States v Shelton, 13 BR (ETO) 1; United States v Morrison, 75 BR 215; United States v Alvey, 1 CMR (AF) 463; United States v Thiel, 18 CMR 934. The first two of the cited cases were actually based upon a specific regulation making the senior person present responsible for the proper operation of the vehicle. The board of review's reliance upon the regulation as the basis for the passenger's liability is apparent from the following excerpt from the Shelton case, supra:

"The evidence adduced . . . proved that at the time of the collision, the three accused were engaged in a joint enterprise. . . . The duty of the driver to stop and render assistance in case of injury to a person, is an incident of the operation of a government vehicle. Under these circumstances each occupant was equally responsible with the driver for the latter's failure to render the necessary assistance . . . as required by the regulation. . . ."

In United States v Alvey, supra, an Air Force board of review held that the passenger's failure to report an accident was a moral not a legal wrong. However, in United States v Thiel, supra, which was decided after our decision in United States v Eagleson, supra, another Air Force board of review reached a contrary result. In that case, the accused, Thiel, was a passenger in a misappropriated vehicle when it struck and damaged public property. He and the driver left the scene forthwith. Later they were apprehended. The board of review recognized that no civilian authorities supported its position, but it determined that a sufficient difference existed between the civilian and military communities to justify a different result. The board of review reasoned that a passenger has the same duty as the operator in regard to giving

**731**

aid to the injured and making his identity known when "his status with respect to the personnel or property involved is such as to impose upon him the affirmative duty of taking such action." According to the board of review, this status depended upon all the circumstances. The manner in which the board of review applied this principle to the facts of the case leads me to conclude that it had merely developed a complicated idea to express the principle of aider and abettor liability. If that is all the board of review intended, I certainly agree with it. State v Gibbs, 227 NC 677, 44 SE2d 201. The mere relationship of superior and subordinate is insufficient to establish criminal liability on the part of the former for the acts of the latter. See United States v Dickenson, 6 USCMA 438, 453, 20 CMR 154. The criminal law deals only with the person committing the prohibited act and those who aid or abet him in the commission of that act. But, regardless of my interpretation of the Thiel case, it is apparent that no ancient military custom determines the problem. United States v Kirksey, 6 USCMA 556, 20 CMR 272; United States v Downard, 6 USCMA 538, 20 CMR 254. As a result, military law provides, as does the general civilian law, that a passenger's responsibility for fleeing the scene of a vehicular accident depends upon whether he acted as an aider and abettor to the driver.

Here, as with the Article 119 Charge, the evidence does not show that Waluski aided and abetted or encouraged Hauf to flee. Speculation is no substitute for proof. Moreover, considering their joint implication in the misappropriation of the vehicle, it is reasonable to presume that each accused was independently anxious to flee from the scene. Consequently, the evidence is insufficient as a matter of law to support the findings of guilty of Charge III as to Waluski.

The decision of the board of review on Charges I and III is reversed as to Waluski, and those charges are ordered dismissed. The record of trial is returned to The Judge Advocate General of the Navy for reference to a board

**732**

of review for reassessment of his sentence on the basis of Charge II. As to Hauf, the decision of the board of review is affirmed.

LATIMER, Judge (concurring in the result):

I concur in the result.

Although the Chief Judge asserts that it is inconsistent to allege a common intent between two or more persons when pleading involuntary manslaughter, I disagree. It may be true that in certain cases a factual inconsistency will be developed by the evidence, but I doubt that such a situation will result in all cases. I need not prove my point by going into other areas as I believe it will suffice to limit myself to cases where death is caused by the use of an automobile. In this case, for instance, culpable negligence can be founded upon excessive speed or failure to keep a proper lookout. If the evidence had shown that Hauf drove at an excessive speed, and that Waluski had actively encouraged him to do so under an agreement that the latter would watch for pedestrians, I would have no difficulty in concluding that the two accused acted "jointly and in pursuance of a common intent" in the doing of culpably negligent acts.

Next, the arguments marshaled by the Chief Judge to show that both Hauf and Waluski were in the front seat at the time of the accident are too speculative for me to accept. Either the fact that Hauf's identification was found at the point where a driver would dismount is enough to establish that he was the operator, or the evidence is insufficient on that score. When consideration is given to the speed of the truck in plunging down a fifteen-foot embankment and coming to rest upright facing the highway, the occupants must have been given a rough ride and been jolted about. It is readily inferable that the contents of Hauf's pockets were shifted around so that when he straightened up on getting to the ground, his personal effects fell from his clothing. I am willing to conclude that the location of those effects is

sufficient to permit the conclusion that Hauf dismounted from the driver's side of the vehicle, and that he was the driver. To support the inference I believe the court-martial could draw, it is immaterial whether Waluski was in the front or the back seat. In either event, he would dismount from the right side. Of course, if he was in the back of the vehicle, it is possible, but not probable, that he exited from the vehicle on the driver's side. However, I am sure that with the top up, a rear seat passenger would encounter a great deal of difficulty in trying to crawl over or under the steering wheel. The right side presents no such laborious mode of departure.

One other ground of departure is worth mentioning. I do not believe military law should be ▌ shaped by the fact that civilian jurisdictions hold only the driver of a vehicle criminally liable for leaving the scene of an accident. The analogy between the civilian and the military communities is simply not apt in this sphere. If we are to consider long-established practice in this area, we would find that military law recognizes no principle which is more firmly fixed than the rule that a military superior is responsible for the proper performance by his subordinates of their duties. Thus, if a Government vehicle is involved, if the passenger is superior in command and rank or grade to the driver, and if the trip has an aura of officiality about it, the passenger in command has a duty to see to it that the driver operates the vehicle carefully. If the vehicle is involved in an accident through a negligent act of the driver, such as excessive speed and—to make my concept readily apparent—the speeding is ordered by the senior, then I believe the one ordering the violation could be charged with, and found guilty of, committing an offense. Applying the age-old principle to this particular type of offense, if the driver of the vehicle attempts to flee from the scene of an accident, the passenger has not only a duty to attempt to prevent the flight of the junior, but a greater duty to remain at the scene of the accident to

render what aid he can, and assist military and civilian authorities in their investigation. Moreover, when Government property is involved, it may well be that all military personnel riding in the vehicle have a duty to remain at the scene to safeguard that property, but certainly there is a duty on the part of the senior to stay. I suggest these areas of departure only to save them for future decision, and I need not announce any definite conclusion, as they are outside the facts of this case.

It is doubtful that there are many acts in the minor crime field which are more likely to bring justifiable discredit upon the military service than the act of fleeing from the scene of an accident by a member of the armed forces when he is in uniform, on an official mission, or using a Government vehicle. Public order demands that he remain at the scene so that the facts concerning the accident may be made known to the authorities, both civilian and military. The civilian community expects the man in uniform to be a protector of law and order, and common courtesy and decency insist that he must not run off and leave an injured person to die. Furthermore, as an incident to military service, he must minimize the damage done to military property. Those are reasons why the law in the civilian sphere should not be controlling, but it would be hard law to hold that a member of the military, inferior in rank or grade to the driver, who follows the senior in flight, is equally guilty of fleeing from the scene of an accident. I, therefore, believe that military law should demand no more than that the senior person present, and the driver, must remain.

In United States v Thiel, 18 CMR 934, an Air Force board of review concluded that among those who have an affirmative duty not to flee from the scene of an accident must be numbered those passengers who are joint actors with the driver in some unlawful enterprise. To me, however, the question of whether a duty to remain exists must turn upon other facts. Pretermitting the protection of Government property, it is, in my view, quite im-

material whether the driver and passenger were engaged in a lawful or unlawful enterprise. The issue is one of responsibility for the accident and its resulting damage, not the prior unlawfulness of the acquisition of the vehicle. The driver must remain because he was in control of the instrumentality at the time of the accident, and he may be primarily responsible for the damage done. The passenger, if he is senior in rank and command under conditions which permit him to issue orders to the driver, must remain because he was and is entitled to exercise control over the driver and the vehicle. In that way he, too, may be responsible for any injuries suffered. The law seeks to have those who are responsible for accidents on the highway available to help the injured and to assist the investigative agencies. As a matter of principle, no member of the armed forces should flee the scene of any crime which he has committed, or where he has aided in its commission, but criminal liability for doing so has only been affixed in certain limited areas. One of those areas finds its root in motor vehicle accidents.

Turning to the facts of this case, there is no evidence that Waluski aided or abetted the culpably negligent operation of this vehicle; he was not superior to Hauf in either grade or command, and hence could not insist that Hauf drive safely and remain at the scene of the accident; there is nothing to indicate that he encouraged Hauf to flee after the accident; and the property involved did not belong to the United States. Therefore, I conclude that the result reached by Chief Judge Quinn is sound, although the route he takes to reach that destination diverges from mine.