UNITED STATES, Appellee

v

ROY F. GREENFEATHER, Private First Class,
U. S. Army, Appellant

13 USCMA 151, 32 CMR 151

No. 15,543

June 15, 1962

*Captain Samuel J. Rozel* argued the cause for Appellant, Accused. With him on the brief was *Captain Jerome D. Meeker.*

*First Lieutenant Peter J. McGinn* argued the cause for Appellee, United States. With him on the brief was *Major Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

### I

A general court-martial convened in Germany convicted accused of wrongful appropriation of a Government motor vehicle, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921; and of negligent homicide, in violation of Article 134 of the Code, 10 USC § 934. The court-martial sentenced him to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for three years. The convening authority approved the findings and so much of the sentence as provided for bad-conduct discharge, forfeiture of all pay and allowances, and confinement at hard labor for one year and six months, and a board of review in the office of The Judge Advocate General of the Army thereafter affirmed.

Upon accused's petition to this Court, we granted review in order to resolve the following three issues:

1. Whether the evidence is sufficient as a matter of law to support the finding of wrongful appropriation.

2. Whether the law officer erred in failing to instruct, *sua sponte*, on the defense of mistake of fact in regard to the offense of wrongful appropriation.

3. Whether the evidence is sufficient as a matter of law to support the finding of negligent homicide.

### II

In view of the assignments granted, it is necessary that we set out the facts in some detail. The record reflects that accused was a member of a transportation company stationed at Kelley Barracks near the Stuttgart-Moehringen area of Germany. On the evening in question he was assigned as driver of an Army sedan to be used by the courtesy patrol. The patrol consisted of two noncommissioned officers whose duty it was to check local bars and off-post gathering places for uniform violations and other minor disciplinary infractions and derelictions. At approximately 7:00 p.m., accused was issued a trip ticket for the vehicle,

stamped on its face in red ink with the words "OFF-POST," and instructed to report to a Sergeant Kelly who was the noncommissioned officer in charge of the evening's courtesy patrol. Until he so reported, the automobile was in accused's control and custody; thereafter, his further instructions were to come from Kelly.

In accordance with his instructions, accused reported to the sergeant at about 7:15 or 7:30 o'clock. Kelly instructed him to drive the other member of the patrol, a Sergeant Janowski, to his home to allow him to change clothes. No other instructions or directions were issued at that time. Accordingly, accused drove Janowski to his quarters, some fifteen miles from the barracks, where the latter put on the prescribed duty uniform, then the pair returned to Kelley Barracks. Sergeant Janowski was left at the Noncommissioned Officers' Club at approximately 9:00 p.m. to eat. Accused had indicated that he, too, was hungry, whereupon Janowski told him " 'all right, you get yourself something to eat and be back at 2200 hours; no later than 2210.' " No request was made by accused, nor was permission given, to go anywhere else; specifically, accused did not ask permission to leave post.

Accused entered the Kelley Barracks Enlisted Men's Club shortly after 9:00 o'clock. There he joined two acquaintances, Privates Arble and Kobus, and consumed a hamburger and a beer. His companions importuned him to take the two of them to Plieningen, a town three or four miles distance from Kelley Barracks, and accused agreed to do so. According to Kobus, they left the club "around five minutes to ten, or ten minutes to ten." Kobus testified that when they entered the car at the Enlisted Men's Club it was drizzling pretty hard and they got a little wet and, further, that a one-way drive from Kelley Barracks to Plieningen would consume fifteen minutes. Defense counsel inquired whether a round trip would consume fifteen or twenty minutes and the witness replied he did not know and indicated he was guessing as to the time necessary and stated Plieningen was just down the road three or four miles.

He did not recall whether it was drizzling at the location of the accident.

Private Arble's deposed testimony was rather uncertain as to details, but was not inconsistent with that of the prior witness. He did, however, state that it had been raining before the accident but did not recall whether it was raining at the time.

Prior to trial accused executed a voluntary statement. It was taken in accordance with Article 31, Uniform Code of Military Justice, 10 USC § 831, and admitted in evidence without objection. Therein he related that while eating at the Enlisted Men's Club with Arble and Kobus they had indicated their desire to go to Plieningen, and he had agreed to take them. He stated that after leaving Kelley Barracks he drove for about a mile on a straight road before it curved to the right, and believed he was traveling at about forty miles per hour just before going into the curve. The car skidded to the left and onto the wrong side of the road as he was going around the curve. He did not see any headlights coming at him but was busy trying to keep the vehicle on the road. Then he looked up and saw two headlights but they were so close that there was nothing he could do. He claimed the street was wet, as it had been raining earlier, but admitted the vehicle had been performing properly prior to the accident and seemed to be in good mechanical condition.

Accused took the stand as a witness in his own behalf. His testimony, although limited to the alleged offense of negligent homicide, was in accord with his extrajudicial statement. He testified it had been raining that day, but he was actually not paying attention to whether the road was wet; that as he was entering the curve at about forty-five miles per hour the car hit a slippery spot and he felt the back end slide from his own side of the highway across and into the left lane. As the auto started skidding to the left he was fighting the wheel and as he went around the corner he did not brake the sedan. He was fighting the car to keep it on the road and did not see any headlights ahead of him until he got the car

pretty well under control and then saw the two headlights. He did not have time to get back into his own lane.

Accused said he went into the curve at approximately forty-five miles an hour knowing it had been raining and the road might be slippery, but he concluded, in view of his driving experience, that it was a safe speed. He had driven the route on numerous occasions, was thoroughly familiar with the road and the area, and had run around that corner many times at fifty miles an hour. He did not feel he was taking the curve too fast for the road conditions, and he figured he could make it at that rate of speed. Although he knew there was a side street coming into the road right in the curve, his thoroughfare was protected by stop or yield right-of-way signs. And, further, while a car could possibly be coming out of the side street, the headlights would be visible as one came into the curve. He was injured in the collision and taken to the hospital; therefore he had no opportunity to inspect the scene after the accident. However, while he did not actually see a slippery spot, he knew it had been raining earlier, and he "just . . . [took] it for granted" a slick spot on the road had caused him to skid on the curve. He was not in a hurry at all, and was not concerned about getting back to Kelley Barracks.

There was no speed limit fixed for the road upon which the collision occurred, but the military speed restriction on this road was fifty miles per hours. Stipulated testimony indicated a local German weather station recorded a light rain shortly after 2:00 o'clock on the afternoon in question, and a thunderstorm between 4:30 and 6:30 p.m.

The witness, Hans Stoller, was the driver of the small German make auto with which accused collided. He testified that he approached the intersection at the curve cautiously and, after looking to determine that the way was clear, turned right from the side street onto the road upon which accused was driving. He proceeded for a very short distance—at a slow speed and well to the right of his own side of the road—

when the two headlights of the military sedan came at him through the night. Everything happened very fast. He was not going faster than twenty-five or thirty kilometers himself but, while he could not give a good estimate of the speed of the American car, it approached him very rapidly. All of a sudden, in the curve, it crossed over to Stoller's side of the road and there was a frontal collision. He only saw accused coming over to the wrong side and could not recall anything that happened thereafter. The collision occurred only minutes after this witness got into his car, and it was not raining at that time.

Stoller and the three passengers in his car were injured and taken to the hospital, as were accused and his two companions. The three passengers in Stoller's auto—his father, mother, and a family friend—died of injuries sustained in the collision.

Hans Gottuck, a German policeman of some fifteen years' experience, testified as an expert witness. He was a surveyor in civilian life, and his police specialty was to take measurements and secure traces and marks of accidents and to make sketches of what he discovered in investigating at the scene of accidents. He arrived at the site of the collision at approximately 10:00 p.m. and made a sketch of the scene which was admitted in evidence. Gottuck explained that diagram and expressed some expert opinions with reference to it. From the sketch and oral testimony it appears accused's car left two skid marks which were some 161 feet and 205 feet in length, respectively. They were made by the left front and left rear tires of the vehicle in a sideward sliding motion. They began one on either side of the center line and extended to the extreme wrong side of the road. Although an accurate appraisal of the speed of the vehicle which made the sliding marks was impossible, the witness Gottuck answered the following question in this manner.

"Q. Can you state, based upon your investigation of this scene, your opinion of what caused the car to skid?

"A. I assume, at any rate, a too

high rate of speed. Furthermore if there was a mistake in operating the vehicle, this I cannot tell."

The evidence shows the sliding skid marks laid down by the car accused was driving commenced at the center line, and continued across into the opposite bound traffic lane so that at a position before the point of impact, the mark left by the front tire was nineteen feet and eight inches from the right edge of the twenty-three foot wide road. The military vehicle came to rest in a ditch on the wrong side of the road, and the German car was knocked back into the intersection, more than twenty-five yards from the apparent point of the collision. Both cars were demolished.

### III

We first consider the assignment that the evidence is insufficient, as a matter of law, to support the finding of wrongful appropriation of the Government sedan. Article 121 of the Uniform Code, supra, provides, *inter alia*, that any person who wrongfully withholds, by any means whatever, from the possession of the true owner any personal property, with intent temporarily to deprive the owner of the use and benefit of such property or temporarily to appropriate it to his own purposes to the exclusion of the owner, is guilty of wrongful appropriation.

In explanation of the conduct proscribed by that Article, paragraph 200b, Manual for Courts-Martial, United States, 1951, sets forth the following example of wrongful appropriation:

". . . while driving a government vehicle on a mission to deliver supplies, withholding the vehicle from the government service by deviating from the assigned route without authority, with intent to visit a friend in a nearby town and thereafter restore the vehicle to its lawful use."

While obviously that statement does not constitute a correct principle merely because it is included in the Manual (see United States v Smith, 13 USCMA 105, 32 CMR 105), it does set forth a valid application of the law. And the facts in the instant case are remarkably parallel to those cited from the Manual, supra.

In United States v Graham, 13 CMR 727, an Air Force board of review considered a charge of wrongful appropriation of a Government vehicle and accurately stated the law with reference to deviation from an official use thereof to a personal one. That opinion points out a number of supposed incidents in which a deviation would not violate the provisions of Article 121, Uniform Code of Military Justice, supra, and other instances would also exist. As appellate defense counsel point out, the conviction in the *Graham* case was reversed by the board of review for insufficiency of evidence. That action by the board exemplifies the distinction which renders the facts in this case violative of Article 121, supra, while the facts in that instance did not. In *Graham*, the authorized use of the vehicle was to carry the accused to Tachikawa or Tachikawa Air Base. The evidence showed no more than the fact that in each of two instances the accused went to a hotel in the City of Tachikawa, disembarked, signed the trip ticket and released the Government car. The board of review held that in the absence of a showing as to a personal character of the use to which the Government vehicles were put, it was insufficient. In the case before us, however, the evidence is uncontroverted that accused was using the sedan to transport two enlisted men friends from Kelley Barracks to a gasthaus at Plieningen for their individual purpose.

In United States v Norris, 2 USCMA 236, 8 CMR 36, it is made clear that so-called "joy riding" constitutes wrongful appropriation under Article 121 of the Code. And in United States v O'Brien, 3 USCMA 325, 12 CMR 81, one assigned to chauffeur certain personnel in a jeep on official business was held to be guilty of wrongful appropriation when he used the vehicle for his personal convenience.

While we agree with the observation of the staff judge advocate in his post-trial advice to the convening authority

155

that the offense of wrongful appropriation in this case was, in its inception, one of the less aggravated instances of its type, the evidence is nevertheless sufficient to sustain the conviction.

## IV

Next we turn to the contention that the law officer erred in failing to instruct, *sua sponte*, on the defense of mistake of fact in regard to the charge of wrongful appropriation of the Government sedan.

A person who takes, obtains, or withholds the property of another, believing honestly, although mistakenly, that he has a legal right to acquire or retain the property, is not guilty of an offense in violation of Article 121, Uniform Code of Military Justice, supra. United States v Rowan, 4 USCMA 430, 16 CMR 4; United States v Sicley, 6 USCMA 402, 20 CMR 118. When such defense of mistake is reasonably raised by the evidence, it is incumbent upon the law officer to instruct the court-martial thereon. However, there is no necessity for such instruction when the evidence at trial does not reasonably raise the issue. United States v Rodriguez-Suarez, 4 USCMA 679, 16 CMR 253; United States v Pitts, 12 USCMA 106, 30 CMR 106.

In the case at bar, while the accused testified at his trial as to the offense of negligent homicide, he limited his testimony to that charge and did not testify regarding the alleged wrongful appropriation. His pretrial statement was admitted in evidence, but in it he makes no claim that he was laboring under any mistake of fact concerning his right to use the Government sedan to drive his friends into the nearby town. That statement asserts no such claim, as he merely stated therein that "KOBUS and ARBLE said they wanted to go into Plieningen and I said that I would take them." Kobus testified in similar vein, and Arble's deposed testimony was only to the effect that accused was on dispatch for courtesy patrol with the vehicle and that they got in the sedan to go to a gasthaus in Plieningen. There is a total absence of evidence as to any lack of intent on the part of the accused, and appellate defense does not point out evidence which could have caused the accused to be under any such mistake of fact. In the absence of evidence to that effect we are not free to infer that one with some two years' experience in driving military vehicles, assigned on this evening to the courtesy patrol, was of the opinion that the words "OFF-POST" on his trip ticket gave him any right to accommodate his friends in any regard or, *a fortiori*, any authority to drive them from the Barracks into town. Nor does the fact that Sergeant Janowski told accused it would be all right for him to get something to eat change the picture. The evidence is uncontroverted that accused was dispatched as driver for the courtesy patrol, and that the assignment of that patrol was to check local bars and gathering places, off post, for uniform violations and other minor disciplinary derelictions. In nowise does this record provide any basis for accused to believe he might use the vehicle for his own personal ends.

There being no evidence to raise reasonably the issue of mistake of fact, the law officer was under no obligation to instruct with reference thereto. United States v Rodriguez-Suarez, supra; United States v Pitts, supra. See also United States v Clark, 1 USCMA 201, 2 CMR 107; United States v Simmons, 1 USCMA 691, 5 CMR 119; United States v Hamilton, 10 USCMA 130, 27 CMR 204.

## V

We finally consider the assignment that the evidence is insufficient as a matter of law to support the findings of negligent homicide.

The existence of simple negligence is sufficient to sustain a finding of guilty of negligent homicide. United States v Clark, supra; United States v Roman, 1 USCMA 244, 2 CMR 150; United States v Kirchner, 1 USCMA 477, 4 CMR 69; United States v Russell, 3 USCMA 696, 14 CMR 114. Indeed, the existence of a greater de-

gree of negligence would constitute a higher degree of homicide. Article 119 (b)(1), Uniform Code of Military Justice, 10 USC § 919. Therefore, to convict it was necessary for the court-martial to find from the evidence, beyond a reasonable doubt, that the accused was guilty of no more than simple negligence. The law officer correctly defined that term as follows:

"You are advised that 'simple negligence' is defined in law as the absence of due care. It is an act or omission of a person who is under a duty to use due care which exhibits a lack of that degree of care for the safety of others which a reasonably prudent man would have exercised under the same or similar circumstances."

We test the facts of this case by the foregoing standard. In so doing, we are to adjudge the same in the light most favorable to the conclusion reached by the finders of fact—the court-martial. United States v McCrary, 1 USCMA 1, 1 CMR 1; United States v Schultz, 1 USCMA 512, 529, 4 CMR 104; United States v Richardson, 1 USCMA 558, 564 and 565, 4 CMR 150.

Admittedly, the military sedan was operating properly, and no suggestion is advanced that mechanical malfunction or failure was responsible for the fatal collision. The cause thereof must, accordingly, be found elsewhere. From this record it is apparent that the court-martial would have been fully justified in finding that the accused, having been admonished to "be back at 2200 hours, no later than 2210," departed from Kelley Barracks not more than fifteen or twenty minutes from the time he was to report back to Sergeants Kelly and Janowski. Speed would, therefore, quite obviously be required whether a one-way trip, or a round trip to Plieningen would take fifteen minutes. The accused knew there was a curve in the road and that there was a street intersection in the curve. As the car began to negotiate that curve it slid to the left side. It is not disputed that the car crossed into the lane for opposite bound traffic and approximately the left-hand edge of the road, where it collided with the vehicle occupied by the three persons killed. The uncontroverted physical facts are that the accused's car skidded sideways for a minimum of 160 feet—probably even farther—and the momentum was still so great that the impact demolished both autos, repelled the German vehicle a distance of over twenty-five yards, and caused accused's car to continue even farther in the original direction of travel after the impact, turn completely around, and face in the direction from which it had come. The German policeman, an expert, opined that the cause of the skid could have been excessive speed, and surely the court-martial was justified in accepting this expert conclusion in view of the indisputable physical facts. With regard to weather conditions—of which the defense sought to make much—the court-martial could have determined that the road was either wet or dry. That factor is not of particular significance in light of the posture of this record, as the care required of accused was that which a reasonably prudent man would have exercised under the same or similar circumstances.

In United States v Waluski, 6 USCMA 724, 730, 21 CMR 46, where one of the charges was involuntary manslaughter, this Court was in agreement that there was no difficulty in concluding the facts supported the requisite finding of culpable negligence. As our opinion notes:

". . . It [the evidence] shows that the vehicle rounded a curve on the wrong side of the road without any apparent diminution of speed. It swung from the left side, where it narrowly missed a pedestrian, clear across to the right edge. Although the speed of the vehicle was not explicitly determined, the court-martial could reasonably conclude from the evidence that it was too fast to permit the driver to exercise effective control over the vehicle. Considering all the circumstances, the court-martial was justified in finding that the jeep was operated in a manner indicating a culpable disregard of the foreseeable consequences."

Culpable negligence is a degree of carelessness greater than simple negligence. Paragraph 198*b*, Manual for Courts-Martial, United States, 1951. The facts in *Waluski,* supra, are little different or more aggravated than those present in this case. We have no difficulty in concluding that the evidence in this case is amply sufficient to justify the court-martial in determining that accused was guilty of negligent conduct which caused the collision resulting in three fatalities.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.