.UNITED STATES, Appellee,

v.

Bruce E. TURNER, Captain, U.S. Army, Appellant.

No. 58,374.
CM 8600309.

U.S. Court of Military Appeals.

Oct. 24, 1988.

For Appellant: *Captain Mary C. Cantrell* (argued); *Lieutenant Colonel Joel D. Miller, Captain Stewart C. Hudson, Captain Robert P. Morgan* (on brief); *Colonel John T. Edwards* and *Lieutenant Colonel Charles A. Zimmerman.*

For Appellee: *Captain Cynthia M. Brandon* (argued); *Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Major Byron J. Braun* (on brief); *Major Thomas E. Booth* (USAR).

*Opinion of the Court*

SULLIVAN, Judge:

During August 1986, appellant was tried by a general court-martial composed of officer members at Kaiserslautern, Federal Republic of Germany. Contrary to his pleas, he was found guilty of two specifications of violating lawful regulations, a single specification of sale of military property, and two specifications of larceny, in violation of Articles 92, 108, and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 908, and 921, respectively. He was sentenced to dismissal, forfeiture of $1,100 pay per month for 6 months, and a fine of

$5,000. The convening authority approved the sentence, and the Court of Military Review affirmed in a short-form opinion.

This Court granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY FAILING TO INSTRUCT THE COURT ON THE REASONABLY RAISED DEFENSE OF MISTAKE OF FACT.

We hold that the military judge prejudicially erred by failing to give the defense-requested instruction in the present case. *See generally United States v. Jackson*, 12 M.J. 163, 167 (CMA 1981).

As part of its case against appellant, the prosecution introduced the following statement[1] made by him prior to trial:

I, Bruce E. Turner, want to make the following statement under oath:

After being informed of my legal rights and the suspected allegations, I want to make the following statement. During May 85, the exact date I can not recall, the original engine in my 1979 Dodge Van, Lic # AN–8593, blew up and I parked it adjacent [to] the motor pool where I work. I had the German employees that work for me check the engine out. They later said that the a valve had blown and a pistol [sic] was blown. I checked with AAFES and they said it would cost between 2,000 and 3,000 to replace/repair the engine. Later I saw SSG STEWART at the junk yard of Ramstein AFB, and I explained to him that I was in the market for an engine for my Dodge Van. STEWART said that he had an engine block and it was excess, for me to send the PLL Clerk over to pick it up. I told the PLL Clerk to go to the motor pool of ADA and see STEWART, to view the engine and see if it would fit my van. The PLL Clerk later returned and told me that he checked the engine block that STEWART had, disclosed it to be a short block and it would not fit my van. I then checked other places but was unsuccessful in locating an engine. Further, the first engine that was placed in my van I do not know exactly where it came from, all I know is that it was obtained by the PLL Clerk, and the German employees put the engine in my van. The work was accomplished by the German employees during non-duty hours. I asked the PLL Clerk where he got the engine and his reply was "Don't worry about it Sir, I have friends." I also saw the engine and it was complete, it was a factory engine, had a lot of rust on the interior and exterior, plus it was on a pallet with sides, the top was off and you could see the top portion of it. After getting the first engine in the van, I drove it for about two (2) weeks and it blew again, the number one valve/pistol [sic] blew. My German employees removed the engine and showed me what was wrong with the engine. I told them to check around and find another pistol [sic], and they said that they could not find a pistol [sic] to match the one that I blew. They also told me that the engine was not a military engine, meaning that the first engine that they put in my van was not a military engine. I then said that I needed another engine and I asked the PLL Clerk if he knew where I could get another engine. He said that he did not know but he would check. About two (2) to three (3) weeks or so, the PLL Clerk came up with another engine for the van, I asked him where he got the engine and his reply was "I have friends." I saw the wooden box that the engine was in and saw numbers written on the side of the box. The PLL Clerk said that it was not a military engine, that it was new and from the factory. I also asked him about the numbers written on the side, he also said don't worry about the numbers because it was not the same box for the engine. Now during the time my German employees re-placed the engine, it was also done during after duty hours, maybe once they started early, between 1500–1600 hrs.

1. This statement is presented in the corrected form in which it was introduced at trial.

Q: Reference to the first engine that you had the PLL clerk check at the motor pool where SSG STEWART work[ed], did STEWART indicate to you that the engine was government property?

A: No, because he said it was excess and it was a 360, and it did not belong to any vehicle's in his motor pool and that I could have it.

Q: Did you suspect that engine to be government property?

A: No I did not.

Q: Reference to the second engine that you had placed in your van, after seeing numbers written on the container, didn't you suspect that the engine was government property?

A: No, not even after the PLL clerk told me that it came in another container.

Q: The second engine that you had placed in the van, is that the same engine that is presently in the van?

A: Yes.

Q: Do you know a person by the name of "R. JANESTONE"?

A: No.

Q: When you talked to STEWART about the engine, he was aware that you needed the engine for your POV?

A: Yes, I told him that I needed the engine for my POV.

Q: Did the PLL clerk tell you anything else about the second engine?

A: Yes, he said the serial number that was on the box of the second engine did not match the numbers of the engine, and it could not be traced. He also said that there was no numbers or serial numbers on the engine.

Q: Who is the PLL clerk?

A: His name is SP4 BLANKENSHIP.

Q: What did you think when BLANKENSHIP brought you a new engine, worth between $2,000 and $3,000, and you got it for nothing?

A: BLANKENSHIP said it was not government property, so I did not think anything about it.

Q: When you sold the vehicle to the German national, did you get the vehicle de-registered prior to the sale?

A: No, because his wife was an American and she was to get an ID card, where the vehicle could be registered in her name and [a]void paying the custom tax. She was to come back in a few days. Because of her statement, I allowed them to keep the plates. I also told them that I was going to stop my insurance on the van.

Q: CPT TURNER, are you saying that you had no prior knowledge that neither of the engines were government property?

A: Yes, I had no prior knowledge that the engines were stolen government property.

Q: When did you assume your present position at the motor pool?

A: 26 Oct 84, officially.

Q: Did you have a policy letter authorizing you and members working in the motor pool to use government tools and equipment to work on privately own vehicles?

A: Yes, but no longer valid since about 10 June 85.

Q: Are POV's inspected at the motor pool, if so/and why?

A: Yes, it's been policy that every one on Landstuhl get their POV's inspected and will get a sticker, blue is for Officers and I think that red is for enlisted. The OIC is COL JONES.

Q: Just what type inspection is done of the POV's?

A: It's a thorough inspection of the vehicles, but the POV's are still inspected and registered at vehicle registration.

Q: Did you pay the German employees to replace the engines for you?

A: Yes, DM 1,100.

Q: Do you have anything you wish to add or delete from this statement?

A: Yes, prior to my arrival POV's had been worked on in the motor pool until the race cars could no longer be worked on in the motor pool.

Q: Is there anything else you wish to add or delete from this statement?

A: Yes, the engines that were pulled and replaced in my POV are not the only time that engines have been pulled and replaced in the motor pool. If suspected stolen property had not been mentioned, there would not been an investigation _____ to materialize.

Q: Is there anything else?

A: No. End of statement.

The judge in this case refused to give a mistake-of-fact[2] instruction based on this evidence, even though one was requested by the defense. In particular, he ruled that an honest, but mistaken, belief that the engines did not belong to the United States was not sufficient as a matter of law to constitute a defense to these larceny charges. He reasoned that a larceny still would have occurred if appellant had believed he was taking property belonging to someone else, *e.g.*, the sovereign government of the Federal Republic of Germany, its 80 million citizens, or its multiple business organizations. Accordingly, since the judge found that the evidence of record did not show that appellant thought he was receiving or selling abandoned property, he gave no instruction on mistake of fact.

▬▬▬▬

 At the outset we note that to be found guilty of the offense of larceny, the prosecution must prove beyond a reasonable doubt that an accused had the specific intent to steal. *See generally* para. 46 c(1)(f)(i), Part IV, Manual for Courts-Martial, United States, 1984. "When one hon-

estly believes he is taking property rightly, the criminal intent necessary to establish larceny is absent." *United States v. Rowan*, 4 U.S.C.M.A. 430, 433, 16 C.M.R. 4, 7 (1954). Accordingly, "A person who takes, obtains, or withholds the property of another, believing honestly, although mistakenly, that he has a legal right to acquire or retain the property, is not guilty of an offense in violation of Article 121, . . ." *United States v. Greenfeather*, 13 U.S.C.M.A. 151, 156, 32 C.M.R. 151, 156 (1962). In the present case, an honest belief on appellant's part that he was entitled to receive these engines was sufficient to constitute this defense. *See generally United States v. Sicley*, 6 U.S.C.M.A. 402, 412–13, 20 C.M.R. 118, 128–29 (1955).

 As noted above, the military judge concluded that this defense did not exist as a matter of law unless appellant believed the engines were abandoned property. Otherwise, he opined that the engines which appellant took could still be said to belong to some other person or that such person had a superior right of possession in them.[3] Such logic ignores the fact that a person may also lawfully receive property from its owner or person with a superior right of possession in this property. Such a person may consentingly transfer the property to another person with or without consideration. *See generally* R. Perkins and R. Boyce, *Criminal Law* 332 (3d ed. 1982). Accordingly, contrary to the holding of the military judge, a mistake-of-fact defense to a larceny charge may exist where evidence shows the accused did not believe the prop-

**2.** R.C.M. 916(j), Manual for Courts-Martial, United States, 1984, states:

*Ignorance or mistake of fact.* Except as otherwise provided in this subsection, it is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense. If the ignorance or mistake goes to an element requiring premeditation, specific intent, willfulness, or knowledge of a particular fact, the ignorance or mistake need only have existed in the mind of the accused. If the ignorance or mistake goes to any other element requiring only general intent or

knowledge, the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances. However, if the accused's knowledge or intent is immaterial as to an element, then ignorance or mistake is not a defense.

**3.** A non-fatal variance may occur when the Government proves a person or entity, other than the one alleged in the specification, owned or possessed the alleged stolen property. *See United States v. Miles*, 11 U.S.C.M.A. 622, 625, 29 C.M.R. 438, 441 (1960); *United States v. Craig*, 8 U.S.C.M.A. 218, 24 C.M.R. 28 (1957).

erty he received was abandoned. *See United States v. Smith,* 14 M.J. 68 (C.M.A. 1982).

■ Our second problem with the judge's ruling on the defense request is his unreasonable characterization of this evidence as simply showing that appellant did not believe the property belonged to the United States. *See generally* Mil.R.Evid. 401 and 402, Manual, *supra.* The pretrial statement asserts that appellant received the first engine from his parts clerk, Specialist Fourth Class Blankenship, who said, concerning its origin, "Don't worry about it, Sir, I have friends." It further asserts that this clerk also stated, concerning the second engine's origin, "I have friends." These declarations were in addition to the other portions of this statement which assert that appellant's German employees said to him that the first engine was not a military engine and that his clerk told him that the second engine was not government property. A rational person could conclude from this evidence that appellant also honestly believed that ownership or a superior right to possession of the engines existed in Specialist Fourth Class Blankenship, in his own right or as an agent for his friends.[4] *See United States v. Jackson,* 12 M.J. at 167. *Cf. United States v. Jett,* 14 M.J. 941–44 (A.C.M.R.1982).

In view of the above, the judge's refusal to give the defense-requested instruction on mistake of fact was legal error. The prosecution exhibit was some evidence that appellant honestly believed that he was lawfully entitled to take the engines as gifts or favors from his parts clerk, Specialist Fourth Class Blankenship. *See United States v. Sicley, supra.* The members, of course, were not required to find such a mistake of fact actually occurred.

However, the removal of this issue from their consideration in this case prejudicially deprived appellant of the core of his defense. *See generally Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

The decision of the United States Army Court of Military Review is reversed as to Charge II and its specification; Charge III and its two specifications; and the sentence. The findings of guilty thereon and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge EVERETT concurs.

COX, Judge (concurring):

I agree with the majority opinion that Captain Turner's statement raises the "mistake of fact" defense and that the military judge erred in not giving the instruction. I write only to set forth our scope of review of such an error. "[I]t is appropriate to test omission of a specific instruction ... for harmlessness." *United States v. Mance,* 26 M.J. 244, 256 (C.M.A. 1988). The majority opinion seems to recognize this principle of law when it states that "the removal of this issue from their consideration ... prejudicially deprived appellant of the core of his defense." 27 M.J. 217, at 221 (12). *See generally Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

*Rose v. Clark, supra,* stands for the following proposition:

> Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, "the Constitution

---

4. Trial defense counsel argued:
 Your Honor says it has to be abandoned. We have a PLL Clerk who has a lot of friends, according to the accused, someone who's involved in trading property; someone who is involved in "I give you this, you give me that"; someone who goes to junkyards; someone who goes around all—or could have gone to all over. And for a favor, he may have received this engine from someone who was enti-

tled to this engine, who built this engine, who had no use for the engine, after he got a hold of it from some other person or place; who had that engine on his property, had no apparent use for it and said, "Okay, you can have it. Why don't you do me a favor, why don't you help me with something later or do something for me later for services return," or for whatever.

entitles a criminal defendant to a fair trial, not a perfect one."

*Id.* at 579, 106 S.Ct. at 3107.

Congress likewise intended for this Court to apply a similar standard to the review of courts-martial. Thus, Article 59(a), Uniform Code of Military Justice, 10 U.S.C. § 859(a), provides that "[a] finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused."

The majority opinion finds that appellant was prejudiced by being deprived of the "core of his defense." Given the facts of this case, especially considering the rank, position, education, and training of appellant, it is difficult for me to believe that he could entertain any belief that he could lawfully receive these two engines from a subordinate junior enlisted soldier. Nevertheless, my view is pure speculation, and because I am satisfied that he was entitled to present this defense through argument and appropriate instructions, I agree that he is entitled to a rehearing as to the larceny specifications. Accordingly, I concur.