UNITED STATES, Appellant

v

GEORGE P. MARGELONY; Private,
U. S. Army, Appellee

14 USCMA 55, 33 CMR 267

 

*Lieutenant Colonel Francis M. Cooper* argued the cause for Appellant, United States. With him on the brief were *Lieutenant Colonel Bruce C. Babbitt, Lieutenant Colonel James G. McConaughy,* and *Captain Jerome Nelson.*

*Captain Daniel H. Benson* argued the cause for Appellee, Accused. With him on the brief were *Lieutenant Colonel Ralph Herrod, Captain Robert L. Brosio,* and *Captain Thomas Stapleton.*

*Lieutenant Colonel Emanuel Lewis,* USAF, on amicus curiae brief.

*Commander Joseph E. Ross,* USNR, on amicus curiae brief.

## Opinion of the Court

QUINN, Chief Judge:

The principal question before us is whether in enacting Article 123a, Uniform Code of Military Justice, 10 USC § 923a, Congress intended to limit to that Article the prosecution of all transactions involving worthless checks.

Before enactment of Article 123a, prosecution of misconduct involving use of a worthless check took a number of different forms. If, for example, personal property of some value was obtained on the false pretense that a check given in payment thereof was good, the act might be charged as larceny or wrongful appropriation, under Article 121, Uniform Code of Military Justice, 10 USC § 921. United States v Littlepage, 10 US USCMA 245, 27 CMR 319; United States v Beasley, 3 USCMA 111, 11 CMR 111. Liability under Article 134, Uniform Code of Military Justice, 10 USC § 934, existed if, without regard to the consideration received, a check was issued with an intent to deceive, and thereafter the drawer dishonorably did not maintain sufficient funds for payment of the ·check on presentment.[1] Article 134 was also violated, if there was no intent to deceive, but, after issuance of a check, the drawer dishonorably failed to maintain or place sufficient funds in the bank to pay the check on presentment. See United States v Downard, 6 USCMA 538, 20 CMR 254; cf. United States v Lenton, 8 USCMA 690, 25 CMR 194.

After the Uniform Code became operative in 1951, difficulties were noted in regard to pleading and proving the separate offenses. We, therefore, recommend that Congress provide an "additional punitive statute having provisions similar to the District of Columbia bad check law." Annual Report of the United States Court of Military Appeals and The Judge Advocates General of the Armed Forces and the General Counsel of the Department of the Treasury, for the period June 1, 1952, to December 31, 1953, page 9. Starting in 1955, bills to effectuate the recommendation were annually presented to Congress. See Anderson, "Article 123(a): A Bad Check Offense for the Military," Military Law Review, July 1962 (Department of the Army Pamphlet 27–100–17), page 145, footnote 2. In 1961, the respective Committees on Armed Services of the House and Senate held hearings on H. R. 7657. Both Committees reported favorably on the bill, and it was passed by Congress without amendment. It provides as follows:

"Any person subject to this chapter who—

---

[1] We recognize that in the case of an officer the charge might be laid under Article 133, Uniform Code of Military Justice, 10 USC § 933. United States v Underwood, 10 USCMA 413, 27 CMR 487.

(1) for the procurement of any article or thing of value, with intent to defraud; or

(2) for the payment of any past due obligation, or for any other purpose, with intent to deceive;

makes, draws, utters, or delivers any check, draft, or order for the payment of money upon any bank or other depository, knowing at the time that the maker or drawer has not or will not have sufficient funds in, or credit with, the bank or other depository for the payment of that check, draft, or order in full upon its presentment, shall be punished as a court-martial may direct. The making, drawing, uttering, or delivering by a maker or drawer of a check, draft, or order, payment of which is refused by the drawee because of insufficient funds of the maker or drawer in the drawee's possession or control, is prima facie evidence of his intent to defraud or deceive and of his knowledge of insufficient funds in, or credit with, that bank or other depository, unless the maker or drawer pays the holder the amount due within five days after receiving notice, orally or in writing, that the check, draft, or order was not paid on presentment. In this section, the word 'credit' means an arrangement or understanding, express or implied, with the bank or other depository for the payment of that check, draft, or order."

Originally, the accused in this case was charged with issuing three worthless checks with intent to defraud, in violation of Article 123a of the Uniform Code. At trial, the court-martial excepted the fraudulent intent allegation, but found the accused guilty of dishonorable failure to maintain sufficient funds on deposit for payment of the checks on presentment, in violation of Article 134 of the Uniform Code.[2] On review, the board of review dismissed the findings of guilty as to the check

offenses (Charge II and its three specifications). It reasoned that the legislative history of Article 123a indicated that Congress intended every offense predicated upon the issuance of a worthless check be prosecuted under the provisions of that Article. In its view, therefore, the court-martial could not, by its findings, eliminate an essential element of the Article 123a offense, but retain the remaining allegations as misconduct in violation of Article 134. See United States v Norris, 2 USCMA 236, 8 CMR 36; United States v Johnson, 3 USCMA 174, 11 CMR 174; cf. United States v Picotte, 12 USCMA 196, 30 CMR 196. The Judge Advocate General of the Army certified the record of trial to this Court for review of the board of review's conclusion. In addition, we granted the accused's cross-petition for review to consider an evidentiary ruling by the law officer and an alleged deficiency in the instructions.

After Article 123a became law, the Air Force, which presented the legislation to Congress on behalf of the Department of Defense, took the position that the Article "pre-empts the [former] offense of making a worthless check with intent to deceive in violation of article 134." Letter, Secretary of Department of the Air Force to Director, Bureau of the Budget, quoted in Department of the Army Pamphlet 27–101–92, February 16, 1962, pages 6–7. At the same time, however, the Air Force indicated the Article did not affect the lesser Article 134 offense of dishonorable failure to maintain sufficient funds for payment of a check on presentment. This interpretation of the meaning and effect of the new Article was adopted by the President. See Executive Order 11009, March 16, 1962, 27 FR 2585. These executive interpretations of Article 123a are, of course, entitled to great weight. United States v Robinson, 6 USCMA 347, 20 CMR 63. But, they

[2] On the basis of these findings of guilty, and a finding of guilty of an unauthorized absence of twelve days, the court-martial imposed a sentence which includes a bad-conduct discharge and confinement at hard labor for twelve months. The convening authority approved the findings of guilty. The board of review reversed and dismissed the bad check specifications, and reduced the sentence for the remaining offense to partial forfeiture for four months and confinement at hard labor for a like period.

can be disregarded if they are "no more than an attempted addition to the statute of something which is not there." *United States v Calamaro*, 354 US 351, 359, 1 L ed 2d 1394, 77 S Ct 1138 (1957).

As originally proposed, Article 123a was to provide an "additional" means of prosecution; it was not advanced as a replacement or substitute for all existing forms of prosecution for transactions dealing with worthless checks. At the hearings on the bill, The Judge Advocate General of the Air Force, who presented the position of the Department of Defense, referred to some of the different problems that existed in each of the several forms of prosecution. The substance of his testimony is contained in the following excerpt from the Hearings before the House Committee on Armed Services, 87th Congress, 1st Session, on H. R. 7657:

"Technical difficulties in pleading and proof in these cases have resulted in either failure to initiate charges or abortive prosecutions, thus permitting offenders to go unpunished, with a resultant adverse impact upon military discipline.

"Prosecution of bad-check offenses under article 121 requires proof of all of the elements of common law larceny or wrongful appropriation, including the requirement for receipt of present consideration. Courts are reluctant to stigmatize an accused with a conviction of this kind in view of the resultant implication of moral turpitude which a conviction for larceny or wrongful appropriation connotes. This is so, notwithstanding the status of an accused's account, that is, no account or insufficient funds, and regardless of the criminal intent at the time of the issuance. The same reluctance exists with respect to convictions of officers under article 133, Uniform Code of Military Justice, which could result in a sentence to dismissal from the service.

"Prosecutions of bad-check offenses under article 134, Uniform Code of Military Justice, likewise present difficulties. Such prosecutions must be predicated upon establishing a criminal intent analogous to that required for proof of larceny by check, that is, intent to deceive, or must be based upon proof of dishonorable postissuance conduct. Under decisional law (*United States v Groom*, 12 USCMA 11, 20 [sic] CMR 11; *United States v Brand*, 10 USCMA 437, 28 CMR 3), the Government must establish, as a specific element, the bad faith or gross indifference of the accused. To do so requires proof of factors such as the time of dishonor, date of return of the check for insufficiency, efforts made by the payee to obtain redemption, whether or not redemption was effected, actions of codepositor where joint accounts are involved, as well as evidence reflecting evasion, false promises, or deceit of accused.

"These problems have been overcome, for example, in the District of Columbia, Missouri, and New York by enactment of special legislation similar to that proposed in this bill.

"Enactment of this measure, by providing a specific statute for bad-check offenses, would relieve the courts of the obligation of stigmatizing an accused with a larceny conviction, eliminate complexities in principle with respect to these offenses, and simplify prosecution of such cases."

Appellate defense counsel contend that The Judge Advocate General's reference to the cases of *United States v Groom*, 12 USCMA 11, 30 CMR 11, and *United States v Brand*, 10 USCMA 437, 28 CMR 3, both of which dealt with the lesser offense of dishonorable failure to maintain sufficient funds, demonstrates an intention to substitute the new offense for existing offenses dealing with the issuance of a worthless check, namely, larceny or wrongful appropriation by means of a bad check, in violation of Article 121, and the two types of bad check offenses under Article 134. The contention reads too much into the reference, and gives too little weight to the stated objectives of the legislation. As set out in the last part of the quoted testimony, these objectives were threefold: (1) To relieve courts-martial of

the obligation of "stigmatizing an accused with a larceny conviction"; (2) to eliminate the "complexities in principle" between prosecutions under Article 121 and the bad check offenses under Article 134; and (3) to "simplify prosecution of such cases." The last named objective is especially significant.

Simplification of prosecutions is, under Article 123a, obtained by means of the presumption that arises on failure to make good on a check "within five days after receiving notice" of nonpayment on presentment. Assuredly, the presumption indicates Congressional intention "to turn the screw of the criminal machinery . . . tighter and tighter." Gore v United States, 357 US 386, 390, 2 L ed 2d 1405, 78 S Ct 1280 (1958). It, therefore, provides well-defined guidelines to the scope of the intention.

The presumption is directed to the accused's intent and knowledge *at the time the check is issued,* not to the accused's state of mind after issuance of the check, which is the important time in the dishonorable failure offense. See United States v Remele, 13 USCMA 617, 33 CMR 149; Addendum to the Manual for Courts-Martial, United States, 1951, January 1963, paragraph 202a, page 30. Since the presumption is not coterminous with all the previous actions, logically and reasonably the new statute was not intended to supplant all the old forms of prosecution. Cf. United States v Toutges, 13 USCMA 425, 32 CMR 425; United States v Borden Co., 308 US 188, 84 L ed 181, 60 S Ct 182 (1939).

Another circumstance pointing away from the idea of total preemption, is the nature of the inquiry Congress made into the practical consequences of the proposed bill. Congress did not ask whether the bill would eliminate all existing law on bad check transactions. Yet, such a question would have been the natural one to ask, if Congress proposed to establish a single form of prosecution. Instead, it asked only about the experience other jurisdictions had with similar legislation. A narrow inquiry of that nature is consistent with an intention to simplify the existing law relating to checks issued with a specific

intention to deceive or defraud; it is incompatible with the idea of a general revision of all existing law on the subject.

As we read the legislative background of Article 123a, we find no intention or desire on the part of Congress to bring the dishonorable failure to maintain offense within the ambit of Article 123a. Accordingly, we answer in the negative the first certified question which asks whether the board of review was correct in holding that Article 123a abolished the offense of wrongfully and dishonorably failing to maintain sufficient funds for payment of an issued check on presentment, in violation of Article 134 of the Uniform Code.

The second certified question deals with the relation of the dishonorable failure offense to an alleged violation of Article 123a. The Government and the *amici curiae* contend the former offense is lesser included within the latter. This view is based, in part, on the fact that the new Addendum to the Manual, supra, specifically lists the dishonorable failure offense in violation of Article 134 as lesser included within a charge laid under Article 123a. The listing is entitled to weighty consideration, but it does not bar judicial review of the correctness of the conclusion. United States v Malone, 4 USCMA 471, 16 CMR 45.

Normally, the allegations in a specification and the proof determine whether one offense is lesser included within another. United States v Hobbs, 7 USCMA 693, 698, 23 CMR 157. It is helpful, therefore, to compare, as we have below, the allegations of the original specification with the findings of the court-martial:

*Article 123a*

1. That with intent to defraud

2. And to procure money

3. The accused made and delivered a specified check

4. "Then knowing" he did not "or would not have sufficient funds" in

**59**

the bank for payment of the check on presentment.

*Offense found under Article 134*

a. For the purpose of obtaining money

b. The accused made and uttered a specified check

c. And "thereafter" he dishonorably failed to place or maintain sufficient funds in the bank for payment of the check on presentment.

Omitting the intent to defraud, the principal difference between the two offenses is in the fourth element listed in the Article 123a column and the last element in the Article 134 column. The words "then knowing" in the specification of the Article 123a offense indicate that the accused's knowledge of the insufficiency of the account must exist at the time of the issuance of the check. See Addendum to the Manual for Courts-Martial, United States, 1951, January 1963, paragraph 202a, page 30. However, the offense of dishonorable failure to maintain or provide funds is directly oriented to the time of presentment. If there is no deficiency in the accused's account at presentment and the check is paid, there is patently no misconduct on the part of the accused. On the other hand, if the check is not paid, the reason for nonpayment determines whether the offense has been committed. If payment was refused because of an error by the bank or some other circumstance unconnected with the accused, there is patently no dishonorable conduct by the accused upon which to predicate criminal liability. See United States v Milam, 12 USCMA 413, 30 CMR 413; United States v Torbett, 17 CMR 650, 660; cf. United States v Remele, supra. Conversely, if nonpayment results from the accused's conduct, and that conduct is dishonorable, the offense is committed. See United States v Downard, supra. However, the Article 123a specification alleges more than just the time of the commission of the offense. It also refers to the state of the account at the time of presentment of the check for payment.

The specification alleges the accused knew he "would not have sufficient funds" for payment of the check on presentment. This allegation calls attention to the time of presentment; and fairly implies that any insufficiency of funds existing at that time was the result of deliberate design or purpose. These circumstances are the essence of dishonorable conduct. United States v Downard, supra. We conclude, therefore, that included within the allegations of the specification is fair notice of the offense of dishonorable failure to maintain sufficient funds, in violation of Article 134. Since there is ample evidence to support the court-martial's finding of guilty of the lesser offense, we answer the second certified question in the affirmative.

Turning to the accused's assignments of error, we consider first whether the law officer erred in his instruction on the defense of duress. The law officer instructed that duress was a defense to the specification laid under Article 123a, but he did not advise the court-martial as to its effect on the lesser offense. If the checks were made under duress, the defense would apply to all aspects of the transaction. In other words, if the accused was improperly forced by others to write the checks, he was under no obligation to provide funds for their payment; consequently, his failure or refusal to maintain a sufficient balance to pay the checks on presentment was not dishonorable conduct. As we said in United States v Lenton, supra, page 693, "Refusal to make good on an instrument which is valid neither legally nor morally can hardly be regarded as dishonorable conduct." To avoid the effect of the instructional deficiency, the Government contends the evidence does not raise an issue of duress.

The accused testified he knew the payees named in the checks set out in the specifications of the Article 123a charge. He was concerned about other checks he had issued for them during a trip to Panama City, so he went to the room of one of the payees, which was in the men's dormitory on the campus of Troy State Teachers College. The payees and several other persons were

present. The accused announced he wanted the money for the checks he had written for them. Two of the men "grabbed" him; they told him if he did not "sign a couple more checks" they were going "to lay into" him. He refused; and they "laid into" him "right there." They "beat" him "in the face" and "in the stomach." They also "threatened" him and his fiancee. Although the accused did not specify the precise nature of the threat, it is reasonably inferable he was told that if he thought he had been "work[ed] . . . over badly," the beating was modest compared to what he would get if they were again to "lay into" him and "get on" his fiancee. Some days later the same persons who had beaten the accused in the room met him on the campus. They "started beating on . . . [him] again"; they hit him "maybe six or seven times" and knocked him to the ground. A campus policeman came on the scene and "helped . . . [him] up." The policeman suggested the accused "see a doctor."

Some parts of the accused's testimony tend to cast doubt upon the truthfulness of his defense. For example, after the first alleged assault, the accused and his fiancee, accompanied by one of the payees, went to Slocomb, Alabama, where the accused spent the night as a guest in the latter's home, while the accused's fiancee stayed with the payee's "girl friend." However, the inconsistencies do not stamp the accused's testimony as unbelievable as a matter of law; nor do they, as the Government maintains, cast "an aura of fantasy," if not "fabrication," over the accused's account of the issuance of the checks. Cf. United States v Remele, supra; United States v Jones, 13 USCMA 635, 33 CMR 167.

Left for consideration is the Government's argument that the evidence of alleged duress does not ▆▆▆ ▆ show fear of great bodily harm. See United States v Fleming, 7 USCMA 543, 23 CMR 7. We need not decide whether, in a prosecution for a relatively minor offense, the defense of duress must be predicated upon fear of death or serious bodily

harm. See United States v Brookman, 7 USCMA 729, 732, 23 CMR 193. Enough appears in the record of trial to support the law officer's conclusion that the accused was placed in fear of great bodily harm. If the accused's testimony is believed, it indicates he was "work[ed] . . . over badly" before the checks were signed. He was hit in the face and in the stomach, and threatened with even worse treatment in the future. That he had good reason to believe the threats were not idle, is evident from his account of the second beating. At that time, his injuries were such as to lead the campus policeman to recommend that he go to a doctor. We conclude, therefore, that the law officer properly submitted the defense of coercion or duress to the court-martial, but erroneously limited its effect to the offenses charged. The error requires reversal of the findings of the three specifications to which it relates.

The decision of the board of review is set aside as to Charge II, and its three specifications, and as to the sentence. The record of trial is returned to The Judge Advocate General of the Army for submission to the board of review for further action consistent with this opinion.

Judge KILDAY concurs.

FERGUSON, Judge (dissenting):

I dissent.

On many occasions, there is room for disagreement about the intent of the legislature in enacting a particular statute. See United States v McCormick, 12 USCMA 26, 30 CMR 26. At other times, there can be no doubt about Congressional meaning. See United States v Toutges, 13 USCMA 425, 32 CMA 425; United States v Norris, 2 USCMA 236, 8 CMR 36; United States v Geppert, 7 USCMA 741, 23 CMR 205; and United States v Wilson, 13 USCMA 670, 33 CMR 202. This case so clearly falls into the latter category that I am shocked at the result which my brothers reach. To say that Congress intended to simplify the law regarding bad checks by adding two new crimes to those already in existence is unsound.

Abraham Lincoln once noted:

"If you call a tail a leg, how many legs has a dog? Five? No; calling a tail a leg don't *make* it a leg."

That exactly sums up my position regarding the principal opinion, and while I have failed to convince my brothers that they have here miscounted the dog's legs, I desire to record my ability to tell the difference.

The statute in question has a long history. Before its enactment, utterance of a bad check might, depending upon the circumstances, be punished as larceny by false pretenses in violation of the Uniform Code of Military Justice, Article 121, 10 USC § 921, or as one of two offenses under either Code, supra, Article 134, 10 USC § 934, or Article 133, 10 USC § 933, *i.e.*, making and uttering a worthless check, with intent to deceive, and thereafter wrongfully and dishonorably failing to maintain sufficient funds on deposit to meet its payment on presentment, and the same misconduct absent any intent to deceive. See Simon, "A Survey of Worthless Check Offenses," Military Law Review, October 1961 (Department of the Army Pamphlet 27–100–14), page 29, *et seq.*

According to the armed services, difficulties arose through "confusion in the selection of charges and trial of the presently available check offenses," Simon, supra, at page 59, and agitation commenced for enactment of a worthless check statute. In a Joint Report to the Congress covering the period June 1, 1952, to December 31, 1953, pursuant to Code, supra, Article 67, 10 USC § 867, this Court, The Judge Advocates General of the Armed Forces and the General Counsel of the Department of the Treasury unanimously made the following declaration:

"FIFTEENTH: At the present time the services have difficulty in prosecuting offenses involving bad checks *because of the lack of any real guidepost to follow.* This has led in those cases to inept specifications, failure of proof, improper instructions, and divergent standards of proof required as between the several services. THEREFORE,

"It is *recommended* that an additional punitive statute having provisions similar to the District of Columbia bad-check law be added to the Code to meet the particular needs of the Services." [Emphasis partially supplied.]

The same recommendation was reiterated by the Court, The Judge Advocates General, and the General Counsel in their Joint Reports for 1954, 1955, and 1956. The discussion in the following year's Joint Report involving the proposed new article was more explicit:

"8. *Punitive articles. The present code does not provide specific statutory authority for the prosecution of bad-check offenses.* The proposed legislation adds an additional punitive article which contains provisions similar to the bad-check statutes of the District of Columbia and the State of Missouri, including a provision that a failure to pay the holder of a bad check the amount due within 5 days shall be prima facie evidence of an intent to defraud. *One of the difficulties arising under existing law is the necessity to prosecute bad-check offenses under one of three separate articles (121, 133, or 134), none of which may be considered as a bad-check statute.* Because of the technical difficulties that arise as a result of the unfortunate pleading of the wrong article, an obviously guilty person sometimes escapes punishment. There are many difficulties inherent in obtaining a conviction of an accused for a bad-check offense without proof of specific intent. *Because of this, the proposed legislation is desirable to provide specific statutory authority for the prosecution of bad-check offenses."* [Emphasis partially supplied.] [Annual Report of the United States Court of Military Appeals and The Judge Advocates General of the Armed Forces and the General Counsel of the Department of the Treasury, Pursuant to the Uniform Code of Military Justice for the Period January 1, 1957, to December 31, 1957.]

The identical recommendation was again made in 1958 and 1959. Because

of circumstances outside the purview of this opinion, no Joint Report was filed in 1960, and, on October 4, 1961, Code, supra, Article 123a was enacted by the Congress in the form recommended. By that time, one authority had specifically called attention to the fact that its passage would preempt prosecution of any worthless check offenses under Code, supra, Article 134. Thus, it was stated:

> "The announced purpose of this amendment is to correct the confusing situation arising from the present law in this field where the offense may be alleged as a violation of Article 121, 133 or 134, and, because of technical difficulties which may arise as a result of pleading the wrong article, guilty persons sometimes escape punishment. Another purpose was to create a presumption relative to the intent to defraud.

> "In view of these purposes, it is clear that, if enacted, this new article will pre-empt at least the Article 134 'bad' check offenses under the Norris doctrine. The 'intent to defraud' portion of the proposed article could be used in all cases where larceny by check is now being alleged, although either could probably be used in most cases. The proposed Article 123a(2) would at least include what is now alleged as the major check offense under Article 134, but is broader in that, in addition to using this article when a check is given for a past due debt, it can also be used when a check is given '. . . for any other purpose. . .' It would, probably, be proper to allege this offense where a worthless check is given as a donation to charity. However, there would be no lesser offense, as presently exists, of issuing a check without intent to deceive or defraud and dishonorably failing to maintain a sufficient balance." [Emphasis partially supplied.] [Simon, "A Survey of Worthless Check Offenses," Military Law Review, October 1961 (Department of the Army Pamphlet 27–100–14), pages 61–62.]

The more immediate history of the legislation reveals that, as predicted by Simon, supra, Congress intended to preempt Article 134 check offenses. At the outset of the hearings on the proposed statute, conducted before a Subcommittee of the House Armed Services Committee, the distinguished Chairman noted:

> ". . . The purpose of H. R. 7657 [now Code, supra, Article 123a] is to amend the Uniform Code of Military Justice so as to provide specific statutory authority for the prosecution of bad-check offenses.

> "There is at present no specific authority in the Uniform Code of Military Justice for the prosecution of these offenses. As a result, those in the service who violate the law by writing bad checks must be prosecuted under one of three different articles, none of which is really a bad-check statute. This raises certain technical difficulties in pleading and proof, and has resulted in allowing many offenders to go unpunished.

> "The proposed revision of the Uniform Code of Military Justice would add an additional article containing provisions similar to the bad-check statutes of the District of Columbia and the State of Missouri." [Emphasis supplied.] [Hearings before House Armed Services Committee on H. R. 7657, 87th Congress, 1st Session, page 1981.]

Appearing as the principal witness before the Subcommittee, Major General Albert M. Kuhfeld, The Judge Advocate General of the Air Force declared:

> "The principal purpose of this bill is to provide specific statutory authority for the prosecution of bad-check offenses. Under existing law, bad-check offenses must be prosecuted under one of three separate articles of the code (art. 121, 133, 134) proscribing larceny, unbecoming conduct, or discreditable conduct, none of which can be considered a bad-check statute.

> "Technical difficulties in pleading and proof in these cases have resulted in either failure to initiate charges or abortive prosecutions, thus permitting offenders to go unpunished, with

**63**

a resultant adverse impact upon military discipline.

"Prosecution of bad-check offenses under article 121 requires proof of all of the elements of common law larceny or wrongful appropriation, including the requirement for receipt of present consideration. Courts are reluctant to stigmatize an accused with a conviction of this kind in view of the resultant implication of moral turpitude which a conviction for larceny or wrongful appropriation connotes. This is so, notwithstanding the status of an accused's account, that is, no account or insufficient funds, and regardless of the criminal intent at the time of the issuance. The same reluctance exists with respect to convictions of officers under article 133, Uniform Code of Military Justice, which could result in a sentence to dismissal from the service.

"Prosecutions of bad-check offenses under article 134, Uniform Code of Military Justice, likewise present difficulties. Such prosecutions must be predicated upon establishing a criminal intent analogous to that required for proof of larceny by check, that is, intent to deceive, or must be based upon proof of dishonorable postissuance conduct. Under decisional law (United States v Groom, 12 USCMA 11, 20 CMR 11; United States v Brand, 10 USCMA 437, 28 CMR 3), the Government must establish, as a specific element, the bad faith or gross indifference of the accused. To do so requires proof of factors such as the time of dishonor, date of return of the check for insufficiency, efforts made by the payee to obtain redemption, whether or not redemption was effected, actions of codepositor where joint accounts are involved, as well as evidence reflecting evasion, false promises, or deceit of accused.

"These problems have been overcome, for example, in the District of Columbia, Missouri, and New York by enactment of special legislation similar to that proposed in this bill.

"Enactment of this measure, by providing a specific statute for bad-check offenses, would relieve the courts of the obligation of stigmatizing an accused with a larceny conviction, eliminate complexities in principle with respect to these offenses, and simplify prosecution of such cases." [Emphasis partially supplied.] [Hearings before House Armed Services Committee on H. R. 7657, 87th Congress, 1st Session, pages 1982–1983.]

In its report to the House of Representatives, the Armed Services Committee remarked:

"The purpose of the proposed legislation is to provide specific statutory authority for the prosecution of members of the uniformed services for bad-check offenses.

"Under existing law, bad-check offenses must be prosecuted under one of three separate articles of the Uniform Code of Military Justice (articles 121, 133, 134) proscribing larceny, unbecoming conduct, or discreditable conduct, none of which can be considered a bad-check statute.

"Technical difficulties in pleading and proof in these cases have resulted in either failure to initiate charges or abortive prosecutions, thus permitting offenders to go unpunished with a resultant adverse impact upon military discipline.

"Prosecutions of bad-check offenses under article 121 requires proof of all of the elements of common law larceny or wrongful appropriation, including the requirement for receipt of present consideration. Courts are reluctant to stigmatize an accused with a conviction of this kind in view of the resultant implication of moral turpitude which a conviction for larceny or wrongful appropriation connotes.

"The same reluctance exists with respect to convictions of officers under article 133, Uniform Code of Military Justice, which could result in a sentence to dismissal from the service.

"Prosecutions of bad-check offenses under article 134, Uniform Code of Military Justice, likewise present dif-

ficulties. Such prosecutions must be predicated upon establishing a criminal intent analogous to that required for proof of larceny by check, or must be based upon proof of dishonorable postissuance conduct. Under decisional law (*United States* v *Groom*, 12 USCMA 11, 20 CMR 11; *United States* v *Brand*, 10 USCMA 437, 28 CMR 3), the Government must establish, as a specific element, the bad faith or gross indifference of the accused. To do so requires proof of factors such as the time of dishonor, date of return of the check for insufficiency, efforts made by the payee to obtain redemption, whether or not redemption was effected, actions of codepositor where joint accounts are involved, as well as evidence reflecting evasion, false promises, or deceit of accused.

"*These problems have been overcome, in various States, for example in the District of Columbia, Missouri, and New York, by the enactment of legislation similar to that proposed herein.*

"In addition, enactment of the proposed legislation, *by providing a specific statute for bad-check offenses, will relieve the courts of the obligation of stigmatizing an accused with a larceny conviction, eliminate complexities in principle with respect to these offenses, and simplify prosecution of such cases.*" [Emphasis partially supplied.] [House Report No. 583, 87th Congress, 1st Session, pages 1–2.]

General Kuhfeld's testimony was substantially repeated before the Senate Armed Services Committee after the House bill was passed and forwarded to the Senate for its consideration. In its report, the Senate Armed Services Committee likewise stated that it was the purpose of the bill to do away with prosecutions under various other Articles of the Code:

"The Uniform Code of Military Justice does not now provide specific statutory authority for the prosecution of bad check offenses. *As a result of the absence of such authority, bad check offenses must be prosecut-* ed under one of three separate articles, none of which is entirely appropriate and each of which presents technical difficulties in pleading and proof that sometimes result in failure to initiate charges or abortive prosecutions.

"Prosecution of bad check offenses under article 121 requires proof of all the elements of common law larceny, or wrongful appropriation, including the requirement for receipt of present consideration. *Courts have been reluctant to convict a bad check offender under this section because of the severe implication of moral turpitude that a conviction for larceny or wrongful appropriation connotes. The same reluctance has existed on convictions under article 133, which could result in a sentence to dismissal from the service.*

"*Prosecutions of bad check offenses under article 134 of the Uniform Code of Military Justice also present difficulties.* Such prosecutions must be based on the establishment of a criminal intent comparable to that required for proof of larceny by check, that is, intent to deceive, or must be based upon proof of dishonorable postissuance conduct. Under decisions of the Court of Military Appeals, the Government must establish, as a specific element, the bad faith or gross indifference of the accused. This requires proof of factors such as the time of dishonor, date of return of the check for insufficiency, efforts made by the payee to obtain redemption, whether or not redemption was effected, actions of codepositor where joint accounts are involved, as well as evidence reflecting evasion, false promises, or deceit of accused." [Emphasis supplied.] [Senate Report No. 659, 87th Congress, 1st Session, pages 1 and 2.]

These background materials admit of no construction other than that the armed services, because of fancied difficulties in prosecuting bad check offenders under Code, supra, Article 121 or the general articles, sought from the Congress specific statutory authority for the punishment of the making and

utterance of worthless checks in order to avoid "certain technical difficulties in pleading and proof" under preexisting law. By providing such authority in Code, supra, Article 123a, each branch of the National legislature noted that it would "relieve the courts of the obligation of stigmatizing an accused with a larceny conviction, eliminate complexities in principle with respect to these offenses, and simplify prosecution of such cases." House Report No. 583, supra, at page 2; Senate Report No. 659, supra, page 2. The language in the reports is repetitive of the testimony of General Kuhfeld before the Subcommittees and of the recommendations in our past Joint Reports. Indeed, the two cases which General Kuhfeld cited as examples of the roadblocks which the armed forces had allegedly encountered in prosecuting worthless check offenses—United States v Brand, 10 USCMA 437, 28 CMR 3, and United States v Groom, 12 USCMA 11, 30 CMR 11—involved the lesser check offense under Code, supra, Article 134. If it was not his purpose to indicate to the Congress that the "problem" presented by these cases would be eliminated by prosecutions under the new statute, why would he have relied upon them and declared to the Subcommittee that the difficulties which these decisions represented had been overcome in the District of Columbia, Missouri, and New York, "by enactment of special legislation similar to that proposed in this bill"? House Hearings, supra, at page 1982. With due deference, I suggest that his purpose—fully adopted by the Subcommittees in their Reports—was to make it crystal clear that approval of the proposed bad check statute would do away with the supposed troubles of the services in this area by providing *spefic* statutory authority for the prosecution of these crimes in lieu of the former proceedings under Articles 121, 133, and 134, "none of which can be considered a bad-check statute." House Hearings, supra, at page 1982.

For these reasons, therefore, I would conclude that Congress, by enactment of Code, supra, Article 123a, intended to abolish prosecution for these offenses under Code, supra, Article 134. United States v Toutges, supra. As it, in the case of Code, supra, Article 121, intended by that special statute to occupy the field of wrongful conversion, see United States v Norris, supra, so also did it here intend to occupy the field of worthless checks. Otherwise, the statements of its Subcommittees, the testimony at the cited Hearings, and the declarations in our Joint Reports become meaningless. Moreover, there would be no reason to enact such a statute. I accord to Congress' action, however, an intention to simplify the law rather than to complicate it by providing new, additional offenses.

In view of my conclusion that the certified question should be answered in the affirmative, I do not express my views on the other issues before us, particularly with respect to whether the offense of which accused was convicted is lesser included in Code, supra, Article 123a. Suffice it to say that I am convinced that the board of review correctly ordered dismissal of the charges on the basis of preemption.

I would answer the certified question in the affirmative and affirm the decision of the board of review.