UNITED STATES, Appellee

v

FRANK R. SIMMELKJAER, Private First Class,
U. S. Army, Appellant

18 USCMA 406, 40 CMR 118

No. 21,696

June 27, 1969

Captain *Daniel R. Vaughen* argued the cause for Appellant, Accused.
With him on the brief were Colonel *Daniel T. Ghent,* Major *John Wall
Hanft,* and Captain *Stephen Arinson.*

Captain *James L. Rider* argued the cause for Appellee, United States.
With him on the brief were Lieutenant Colonel *David Rarick* and Major
*Edwin P. Wasinger.*

## Opinion of the Court

FERGUSON, Judge:

The accused was convicted of assault with a deadly weapon (Charge I), two specifications of willful disobedience of a lawful order (Charge II), and violation of a lawful general regulation (Charge III), in violation of Articles 128, 90, and 92, Uniform Code of Military Justice, 10 USC §§ 928, 890, and 892. He had pleaded guilty to Charges I and III, but not guilty to Charge II and its two specifications. He was sentenced to a dishonorable discharge, confinement at hard labor for thirty-six months, forfeiture of $95.00 per month for a like period, and reduced to the grade of E-1. The convening authority disapproved the finding of guilty of specification 2 of Charge II, affirmed the remainder, and reduced the period of confinement and forfeitures to thirty months each. A board

406

of review affirmed without opinion and we granted review to consider the following issue:

Whether the law officer erred by failing to instruct on the effect of fear upon the element of willfulness under specification 1, Charge II.

Under the pertinent specification the accused, charged with "having received a lawful command from First Lieutenant Donald F. Baker, his superior officer, to accompany him to the company orderly room, did, at Tay Ninh, Republic of Vietnam, on or about 17 November 1967, willfully disobey the same."

The Government's evidence consisted of the testimony of a single witness, Lieutenant Baker. He testified that he was the company executive officer and that on the evening in question he received a call from the company commander instructing him to locate and arrest the accused and place him under guard in the orderly room. Accompanied by three armed guards from the company weapons platoon and one Lieutenant Ward, he went through the company area searching for the accused. It was dark so he used a flashlight. As he approached a group of people he called out the accused's last name and the latter answered, "Yes, sir." Thereupon, the Lieutenant advised the accused that he was placing him under arrest and ordered him to proceed under guard to the orderly room. According to the Lieutenant, the accused said, " 'I'm not going up there; I would prefer to go with the MP's.' " When he was certain that the accused was not going to obey the order, Lieutenant Baker departed the area to call the company commander and met the latter on the way. They both returned to the scene where the company commander gave a similar order which the accused also refused to obey.[1] The Lieutenant called the military police. When they arrived, the accused willingly submitted himself to their authority. During the proceedings, which lasted some twenty to thirty minutes, the Lieutenant testified that the accused "respected my rank. He was courteous." When asked whether the accused told him he was afraid, the Lieutenant replied:

"He didn't tell me. He said something to the effect—to the company commander—about being shot in the back."

The accused testified as follows:

"Q. Okay, I'm going to ask you to tell the court, Simmelkjaer, just what took place on the night of 17 November with relation to Charge II to which you pleaded not guilty.

"A. We had gotten out of the PMO that evening about quarter after five. We were turned loose by the MP's. We stopped off and had a beer. We weren't given any instructions or anything; we were just turned loose and told, 'Okay, you're free. Take off.' We stopped off and had a couple of beers. Then we returned to the company. We were sitting outside our tent most of the evening. At nine-thirty or ten o'clock, it was pretty late, I was standing about like this and to my right heard someone walking. The next thing I knew I had a flashlight in my eyes and Lieutenant Baker said, 'Simmelkjaer', and I said, 'Yes, sir'. I don't know whether it was Lieutenant Baker or not, but someone said, 'Don't move!'. Then I started to walk up to Lieutenant Baker and I said, 'Yes, sir.' He said to me, 'Simmelkjaer, I'm placing you under arrest and I want you—I'm ordering you—to go to the orderly room.' Well, I said, 'Well, why, sir?', and I turned around and then I seen the guards. I said, 'What's this, sir?' He said, 'It's none of your business.' Then I said, 'Sir, I'd go with you but I would've come up there on my own—you could have called me up there by myself'. He said, 'Never mind that. I'm order-

<hr/>

[1] Failure to obey the order of the company commander was charged as specification 2 of Charge II. It was dismissed on the ground that it was the same order as in specification 1 and that "the accused should not stand convicted on both Specifications (Para 26b, MCM, 1951)."

ing you to go to the orderly room.' At that time two of the guards had moved around the . . . left side of me and one of the guards went around back. I had my back to the building. One of the guards went around to the back of the building like he expected me to run or something like that. At that time I noticed the M-16's, flak jackets, steel pots, and dust covers off indicating that the bolt was forward. I can't really say if the safety was on or not. One guard that was directly in front of me leveled his rifle and his hands were shaking. He was a PFC. I turned to Lieutenant Baker and I said, 'Sir, I respectfully request that I be turned over to the MP's, sir. I'm in fear of my life because I believe I'll be shot in the back.' He said, 'You hold him right here. I'm going for the Captain' or something like that. When he left, the guard that was over here, he moved around. Lieutenant Baker was standing here.

"DC: Let the record indicate that the accused is pointing to his right front to designate the position of Lieutenant Baker, and to his left front to indicate the position of one of the guards.

"A. Well, the one who was here, he moved around like to block off the path—like to block it off. The one on the right, he moved around and he said, 'Don't put your hands in your pocket.' I said, 'I'm not putting my hands in my pocket. Everybody can see that I've got my hands up in the air', just like that (gesturing). So this young fellow— this soldier—says, 'Well, you know if you make a move, I'm going to kill you', just like that. And I said, 'How do you feel saying this to me? You know this could very well happen to you. Do you know what you're saying?' He said, 'Never mind; don't say anything.' Captain Gayle came up. At that time they stood about 10 feet away from me. First he asked what was going on, telling the men standing around to pull the tent flaps down and to go

on inside the tent. Some of the men refused to pull down the tent flaps. They didn't want to leave. They wanted to see what was going to happen. At that time he turned around to me and he said, 'PFC Simmelkjaer, I'm ordering you to go to the orderly room and I'm placing you under arrest.' I said, 'Sir, I've already sent for the MP's, sir. I'll gladly go with them, sir, but under the circumstances, if you can see how these guards are—they're not qualified, sir—I'd just as soon go with the MP's, sir. I've called the MP's and the MP's are on their way.' He said, 'Well, the hell with it; get the MP's here.', just like that. So, I remained there with my hands straight in the air until the MP's got there and I walked straight over to them and they took me down to the PMO."

In addition, the accused testified that this incident took place about four to five hours after his release from the Provost Marshal's office, where he and others had been lodged following an earlier disagreement in which weapons were involved. This resulted in his being charged with having committed an assault with a deadly weapon (a hand grenade), one of the offenses (Charge I) to which he pleaded guilty in this case. In the interim, no one had informed him he was to be arrested. On cross-examination, he iterated that he had heard the orders of both the Lieutenant and the company commander, but had refused to obey them "[i]n fear of my life."

A defense witness testified as to the tenseness of the situation and stated that he, too, was afraid. He corroborated the accused's story that the Lieutenant told Simmelkjaer "don't move." When he heard this he looked around and "saw about five people standing there with flak jackets, steel pots on their heads, they had M-16's and had the weapons pointed at him [the accused] like that (gesturing)." At the request of the accused, he went to get the MP's.

It was the defense contention at

trial and at this level that the accused's disobedience of Lieutenant Baker was not *willful,* an essential element of the charged offense. Rather, *according to counsel,* he refrained from obeying the order out of a genuine fear for his personal well-being. In essence, counsel contend that the accused's fear negated the element of willfulness.

In his instructions to the court, the law officer told the members that, "The words 'willfully disobeyed' mean purposeful, knowledgeable, conscious, and deliberate defiance of authority." He also told them that "the motivation, reasonable or not on the part of the accused, is immaterial."

Appellate defense counsel contended that the accused's fear in this case was such as to raise the issue of duress as a defense to the element of willfulness and to require the law officer, *sua sponte,* to instruct thereon.

The Government argued that the defense confuses motive with intent; that the record is clear the accused *intended* to disobey the order, and that his *motive,* as instructed, was immaterial to the issue. The Government conceded that if the issue of duress was reasonably raised by the evidence, the law officer was under a duty to instruct thereon; however, Government counsel asserted, the accused's fear was unreasonable and, hence, the defense of duress was not in issue.

In United States v Ferenczi, 10 USCMA 3, 7, 27 CMR 77, this Court said:

". . . So long as the disobedience of the order is willful, it matters not what motivated the disobedience *unless the motivation establishes a defense.*" [Emphasis supplied.]

The question of whether the defense of duress was raised by the evidence

was before us in United States v Pinkston, 18 USCMA 261, 39 CMR 261. That accused had pleaded guilty, *inter alia,* to specifications alleging larceny and wrongful appropriation of Government property. In mitigation he testified that he had taken the material because his life and the lives of his son and fiancee had been threatened, and, further, that a friend had been shot as a direct result of the latter's participation in this operation. In holding that this testimony was sufficient to place the law officer on notice of the existence of a potential defense to the allegations of larceny and wrongful appropriation, we said, at page 262:

"The defense of duress is available to an accused who was acting under a well-grounded apprehension of immediate death or serious bodily harm. See United States v Fleming, 7 USCMA 543, 23 CMR 7. See also 21 Am Jur 2d, Criminal Law, § 100, Coercion or duress, page 180; Annotation: Coercion, compulsion, or duress as defense to criminal prosecution, § 2, Nature and elements of duress or coercion, page 910, and § 5, Fear based on threats or injury to others, page 917, 40 ALR 2d."[2]

Cf. United States v Olson, 7 USCMA 460, 22 CMR 250. See also United States v Margelony, 14 USCMA 55, 33 CMR 267, where we held that although the law officer properly instructed on the defense of duress to a charge of passing worthless checks, he erred by not extending this instruction to the lesser included offense of failing to maintain sufficient funds, since the defense, if raised by the evidence, applies to all aspects of the transaction.

In the case at bar, the accused testified that he did not obey the order because he was in fear of being shot in the back by one of the armed guards

---

[2] Manual for Courts-Martial, United States, 1969, paragraph 216f, provides:

". . . Except when he kills an innocent person, a person cannot properly be convicted for committing an act for which he would otherwise be criminally responsible if his participation in it is caused by the degree of coercion or duress recognized in law as a defense. This degree of coercion or duress is a reasonably grounded fear on the part of the actor that he would be immediately killed or would immediately suffer serious bodily injury if he did not commit the act."

who accompanied Lieutenant Baker. His fear was premised on the fact that there was unrest in the company, his arrest, which was unexpected, occurred in the dark of night, and was accomplished by the use of three battle-dressed, armed soldiers. One of the guards, who stood directly in front of him, "leveled his rifle and his hands were shaking." The accused asked that the military police be called and he surrendered to them.

Since the accused testified that he feared death or serious bodily injury, the issue to be resolved by the finders of fact was whether this fear was well-grounded, *i.e.*, reasonable. United States v Pinkston, supra. Absent appropriate instruction on this aspect of the accused's defense, the court members were unaware of it and without "lucid guideposts" by which they could "knowledgeably apply the law to the facts as they find them." United States v Smith, 13 USCMA 471, 474, 33 CMR 3.

The test whether a defense is reasonably raised is whether the record contains some evidence to which the military jury may attach credit if it so desires. United States v Evans, 17 USCMA 238, 38 CMR 36, and cases cited at page 242. See also United States v Meador, 18 USCMA 91, 39 CMR 91. When an affirmative defense is reasonably raised by the evidence, the law officer is required, *sua sponte*, to instruct thereon. United States v Meador, supra; United States v Oisten, 13 USCMA 656, 33 CMR 188.

The decision of the board of review with reference to Charge II is reversed. The record of trial is returned to the Judge Advocate General of the Army. The board of review may reassess the sentence on the basis of the remaining findings of guilty or a rehearing on Charge II may be ordered.

Chief Judge QUINN concurs.

DARDEN, Judge (dissenting):

I believe that in the circumstances of this case the defense of duress should not be available to one who received a *lawful* order from *lawful* authority.

I would affirm the decision of the board of review.